### BLYNN *v.* CITY OF PONTIAC.

MUNICIPAL CORPORATIONS—MASTER AND SERVANT—POLICEMEN—DIS-TINCTION BETWEEN SERVANT AND PUBLIC OFFICER — PONTIAC CHARTER.

> Under the charter of the city of Pontiac, which provides for the appointment of policemen by the city commission and that the police department should consist "of a chief of police and as many subordinate officers, policemen, and employees as the commission shall by ordinance determine," and also providing that the commission shall make the necessary rules to regulate the police department and the duties "of officers and employees of such department," policemen who took oath of office under the charter were not employees of the corporation, but were public officers not entitled to compensation under the workmen's compensation law.[1] Act No. 10, Extra Session 1912 (2 How. Stat. [2d Ed.] § 3945).

Certiorari to the Industrial Accident Board. Submitted January 12, 1915. (Docket No. 70.) Decided March 18, 1915.

Gertrude L. Blynn presented her petition against

---

[1] The question as to whether policemen are public officers is discussed in a note in 36 L. R. A. (N. S.) 881.

the city of Pontiac for compensation for the death of her husband. From an order awarding compensation, defendant brings certiorari. Reversed, without new trial.

*Aaron Perry*, for appellant.

*A. L. Moore*, for appellee.

This is an appeal from a decision of the Industrial Accident Board, affirming an award made to the applicant by an arbitration committee on account of the death of Millard F. Blynn, her husband, who was killed on the 2d of January, 1912, while riding in an automobile with two other policemen; the automobile colliding with a telegraph pole. The facts stipulated by counsel are as follows:

(1) By virtue of the provisions of the Constitution of the State of Michigan, and Act No. 279, Pub. Acts 1909, the city of Pontiac, Mich., adopted in 1911 a charter providing for a commission form of government, and has been operating under such charter since that time.

(2) Section 1 of chapter 5 of said charter, among other things, provides that "all powers conferred on the city shall, unless otherwise provided in this charter, be exercised by a mayor and two commissioners, who together shall be known and designated as the commission."

(3) Section 1 of chapter 6 of said charter provides that "the executive and administrative powers and authority of the city not herein otherwise provided for shall be distributed among six departments as follows: (1) Department of public safety. (2) Department of finance. (3) Department of water supply. (4) Department of public utilities. (5) Department of streets and public improvements. (6) Department of sewers and drainage."

(4) Section 2 of said chapter provides that "the mayor shall be the commissioner of the departments of finance and public safety."

(5) Section 1 of chapter 7 provides that "the commission shall determine and assign the duties of the

several departments, except as in this charter otherwise provided."

(6) Section 5 of said chapter reads as follows: "All appointive officers of the city shall perform such duties as shall be prescribed by ordinance and this charter and which may be required by the commission and their heads of departments."

(7) Section 2, chapter 7, of the charter, provides, among other things: "The mayor shall also have special supervision of, and be charged with, the proper administration of the police, fire, and health departments."

(8) Other sections in the charter give to the two other commissioners definite departments of work, such as sewers, drains, streets, etc., under one heading to one, and water supply and public utilities to another.

(9) Section 10, chapter 7, provides: "Each member of the commission shall have authority to employ such employees as may be necessary to conduct their several departments in an efficient manner, and such employees may be discharged at the pleasure of the member making such appointment."

(10) Section 8, chapter 7, provides: "The mayor may, and shall, at the request of the commission, appoint a city attorney, chief of fire department, chief of police, and health officer, subject to the confirmation of the commission. All of such appointees shall be removable at the pleasure of the commission."

(11) Section 14 of said chapter provides: "That the commission shall by ordinance define the powers and duties of all city officers, whether elected or appointed, where the same have not been defined by this charter. Additional duties may be imposed on such officers whose duties are partially defined hereunder."

(12) Section 24 of said chapter reads as follows: "Every appointive officer shall, before he enters upon the duties of his office, subscribe and file with the city clerk an oath to support the Constitution of the United States and the Constitution of the State of Michigan, and to faithfully perform the duties of the office to the best of his ability."

(13) Section 15 of chapter 8 of said charter reads as follows: "Prosecutions for violation of the ordi-

nances of the city may be commenced by warrant, and all process in such cases shall be in the name of the 'People of the State of Michigan.' The practice in such cases shall be the same, as near as may be, as in criminal cases cognizant by justices of the peace under the general laws of the State."

(14) Section 16 of said chapter reads as follows: "All process issued in any prosecution or proceeding for the violation of any ordinance shall be directed to the chief of police or to any police officer of the city or county of Oakland, and may be executed in any part of the State by said officer or any other officer authorized by law to serve process issued by a justice of the peace."

(15) Sections 4, 5, and 6 of chapter 10 of said charter read as follows:

"SEC. 4. The commission shall by ordinance establish and provide for the maintenance of a police department and a fire department.

"SEC. 5. The police department shall consist of the chief of police and as many subordinate officers, policemen, and employees as the council shall by ordinance determine.

"SEC. 6. The commission shall by ordinance make and establish rules for the regulation and government of the police department, prescribe and define the powers and duties of the officers and employees of such department, and shall prescribe and enforce such police regulations as will most effectually preserve the peace and good order of the city, preserve the inhabitants from personal violence, and protect public and private property from destruction by fire and unlawful depredation."

(16) Since the adoption of this form of government by the city of Pontiac, it has been the practice of the mayor to appoint policemen, and such as have been discharged have been discharged by the mayor without any action on the part of the commission as a whole in any way whatsoever. Policemen are not appointed for any definite term; no vote of the commission has been required to approve their appointment.

(17) No printed rules or regulations were ever adopted by the police department, and none were in force at the time of the appointment and death of Mil-

lard Blynn. No printed rules had been issued pre-
scribing the beat limits or the portions of the city
that the various policemen were required to control.
Policemen were not required to make written reports
of their doings or their whereabouts at any time other
than to make returns of service of process when serv-
ed by them. They were required to call up the central
office at stated intervals by phone and report their
whereabouts and what, if anything, unusual had oc-
curred.

(18) April 29, 1911, the commission of said city
made and passed an ordinance entitled "An ordinance
fixing and determining the compensation of the ap-
pointive officers of the city of Pontiac, prescribing
their duties where not prescribed by charter, and re-
pealing all ordinances and parts of ordinances con-
flicting herewith." That ordinance took effect at the
expiration of 30 days from its passage, and sections
1, 2, 3, and 4 thereof read as follows:

"SEC. 1. The appointive officers of the city of
Pontiac hereinafter named shall be entitled to and
shall receive from the said city of Pontiac, in full pay-
ment for all services to be performed by such officers
and employees, except as herein otherwise provided,
the several amounts hereinafter designated and
named.

"SEC. 2. The chief of police shall be entitled to and
shall receive the sum of one thousand dollars per
annum, payable in semi-monthly installments.

"SEC. 3. The police force of the city of Pontiac
shall consist of a chief of police and seven regular
policemen to be appointed by the mayor by and with
the consent of the commissioners of said city, and
such other special police to be appointed by the mayor
from time to time as in his judgment emergency or
necessity may require.

"SEC. 4. The regular police of the force shall be
entitled to and shall receive the sum of nine hundred
dollars per annum payable in semi-monthly install-
ments. Special police shall be entitled to and shall
receive the sum of two and one-half dollars per day.
In addition to the regular compensation of police
officers regular members of the force shall be entitled
to and shall receive such fees for the services of
process as is permitted by statute."

(19) That ordinance contains other sections with reference to the duties and salaries of the city clerk and other appointed officers, but no further provisions having any reference to police officers or the police force of said city.

(20) On the 11th day of March, 1912, said commission amended section 4 of said ordinance (such amendment to take effect on the first Monday of May, 1912) so as to read as follows:

"Sec. 4. The regular police of the force shall be entitled to and shall receive the following compensation, to wit: New men, at the rate of nine hundred dollars per annum for the first year; nine hundred and fifty dollars per annum for the second year; and the sum of one thousand dollars per annum for the third year and subsequent years. Men who have served on the police force of said city one year shall receive the sum of nine hundred and fifty dollars per annum for the first year's service under this ordinance, and one thousand dollars per annum for the second year and subsequent years, and men who have served on the police force of said city for two years shall receive the sum of one thousand dollars per annum for the first year under this ordinance and the sum of one thousand dollars per annum thereafter, all of said sums payable in semi-monthly installments; special police shall be entitled to and shall receive the sum of two and 50-100 dollars per day. In addition to the regular compensation the police officers and regular members of the force shall be entitled to and shall receive from other sources such fees for the service of process as is permitted by statute for sheriffs and constables."

(21) The appointment of the chief of police has from year to year been submitted to the commission for their approval, but the appointment of the police, regular or special, has never been submitted to the commission for approval, nor has their dismissal from service been submitted to the commission. They have been hired or discharged by the mayor at will.

(22) Section 21, chapter 7, of the charter, in the enumeration of the municipal powers of the commission, and their right to enact ordinances, contains this language: "May enact all laws and ordinances relating to its municipal concerns, and shall have and

exercise all governmental and police powers, subject to the limitations prescribed by this charter, the Constitution and laws of the State and of the United States."

(23) The deceased, Millard F. Blynn, was appointed a policeman of the city of Pontiac, January 2, 1912, by Robert J. Lounsbury, then mayor of said city, by a written appointment, of which the following is a copy, to wit:

"PONTIAC CITY COMMISSION.

"R. J. LOUNSBURY, Mayor.
"DICK DEWEY, Commissioner.
"WM. H. OSMUN, Commissioner.
"PONTIAC, MICH., Jan. 2-12.

"I hereby appoint Millard Blynn as policeman for the city of Pontiac.

"R. J. LOUNSBURY, Mayor."

And on said day executed and filed with the city clerk of said city the following oath of office, to wit:

"STATE OF MICHIGAN,
"County of Oakland—ss.:

"I do solemnly swear that I will support the Constitution of the United States, and the Constitution of this State, and that I will discharge the duties of the office of policeman of the city of Pontiac, said county and State, to the best of my ability.

"MILLARD F. BLYNN.

"Subscribed and sworn to before me this 2d day of January, A. D. 1912.

"R. J. LOUNSBURY,
"Notary Public, Oakland County, Mich.
"My commission expires Jan. 26, 1913."

(24) From his said appointment to the time of his death, said deceased was regularly paid semi-monthly his salary, at the rates fixed by the above-specified ordinance made and passed April 29, 1911, and the above-specified amendment thereof, such several installments being first audited and allowed by the commission of said city while in session as such commission by resolution thereof, and during all said term all the members of said commission knew that he was acting as a policeman in said city.

KUHN, J. (*after stating the facts*). Section 7,

pt. 1, Act No. 10, Pub. Acts 1912 (Extra Session), (2 How. Stat. [2d Ed.] § 3945), provides in part as follows:

"The term 'employee' as used in this act shall be construed to mean: (1) Every person in the service of the State, or of any county, city, township, incorporated village or school district therein, under any appointment, or contract of hire, express or implied, oral or written, except any official of the State, or of any county, city, township, incorporated village or school district therein."

The decision of the Industrial Accident Board can be affirmed only if it is found that a policeman of the city of Pontiac, under the facts stipulated, is an employee and not a public officer.

Policemen generally are charged with the especial duty of protecting the lives of citizens within certain territorial limits, and of preserving the public peace. The preservation of the public peace being a matter of public concern, it has therefore been said that policemen may be considered as public officers. As a rule, they are appointed under authority given by the State, and therefore have generally not been regarded as servants or agents or as otherwise bearing a contractual relation to the municipality. *Schmitt* v. *Dooling*, 145 Ky. 240 (140 S. W. 197, 36 L. R. A. [N. S.] 881 and note, Am. & Eng. Ann. Cas. 1913B, 1078).

Chief Justice Marshall distinguished an office from a simple employment in the case of *United States* v. *Maurice*, 2 Brock. (U. S.) 96, 103 Fed. Cas. No. 15,747, as follows:

"Although an office is an 'employment,' it does not follow that every employment is an office. A man may be certainly employed under a contract, express or implied, to do an act, or perform a service, without becoming an officer. But if the duty be a continuing one, which is defined by rules prescribed by the government, and not by contract, which an individual is appointed by government to perform, who enters

on the duties appertaining to his station, without any contract defining them, if those duties continue, though the person be changed, it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer."

In the case of *Throop* v. *Langdon*, 40 Mich. 673, Mr. Justice COOLEY expresses the distinction as follows:

"The officer is distinguished from the employee in the greater importance, dignity, and independence of his position; in being required to take an official oath, and perhaps to give an official bond; in the liability to be called to account as a public offender for misfeasance or nonfeasance in office, and usually, though not necessarily, in the tenure of his position."

The court of criminal appeals of Texas has decided that "a policeman of a city is a public officer holding his office as a trust from the State, and not as a matter of contract between himself and the city; the word applying equally to every member of the police force," and that "a policeman is a public officer of the State expressly charged by the statutes with enforcing a large body of the criminal law." *Ex parte Preston* (Tex. Cr. App.), 161 S. W. 115. See, also, *Woodhull* v. *Mayor*, 150 N. Y. 450 (44 N. E. 1038); 2 McQuillan on Municipal Corporations, p. 940; 5 *Id.* p. 5049; 28 Cyc. p. 497.

Counsel for applicant does not, however, take exception to these authorities as to the status of a policeman generally, but says that they do not bear upon the situation here presented, because the city of Pontiac in its charter has determined it and has classified its policemen as employees. Assuming that the position of counsel for the applicant is tenable, that the city has the authority under the home rule provision of the Constitution to determine that a policeman, who generally would be regarded as an officer, should for the

purposes of the workmen's compensation law be regarded as an employee (which we do not decide), we are not satisfied that such a conclusion is the proper one to arrive at upon a careful study of the various charter provisions with reference to the police force of the city of Pontiac. A study of these various provisions is convincing that it was the purpose therein manifested to leave the policemen in the category of appointive officers, and not to make them merely employees. This, we think, is apparent from the wording of sections 5 and 6 of chapter X of the charter, which provide as follows:

"SEC. 5. The police department shall consist of the chief of police and as many subordinate officers, policemen, and employees as the commission shall by ordinance determine.

"SEC. 6. The commission shall by ordinance make and establish rules for the regulation and government of the police department, prescribe and define the powers and duties of the officers and employees of such department, and shall prescribe and enforce such police regulations as will most effectually preserve the peace and good order of the city, preserve the inhabitants from personal violence, and protect public and private property from destruction by fire and unlawful depredation."

It is clear that in the department of police it is sought to distinguish between officers and employees, and in section 5 policemen are spoken of independently of employees.

It is true that section 10 of chapter VII, which provides that each member of the commission shall have authority to employ such employees as may be necessary to conduct their several departments in an efficient manner, and that such employees may be discharged at the pleasure of the member making such employment, is the only section in the charter which provides for the appointment of policemen. But, in view of the distinction clearly made in the sections

with reference to the police department, the word "employees" used in this section should not be held to have been used in any other than the comprehensive sense of including all persons serving the public in these departments, whether filling an appointive office or merely occupying a temporary contractual relation to the municipality as an employee; and this use of the word should not be held to deprive a policeman of the city of Pontiac of the dignity and importance which it is generally recognized attaches to his position.

It is said that in the case of *Attorney General* v. *Cain*, 84 Mich. 223, on page 227 (47 N. W. 484 on page 485), it was held that a policeman was not a public officer. But that was a *quo warranto* proceeding and the court said:

"We do not think the position of policeman, under these circumstances, is such an office as authorizes the attorney general to file an information by *quo warranto* in this Court to test the title to the position. It was said in *People* v. *De Mill*, 15 Mich. 182 [93 Am. Dec. 179] that:

"'There are grades of positions denominated "offices" which do not rise to the dignity of being entitled to the notice of the attorney general by information.' See, also, *Throop* v. *Langdon*, 40 Mich. 686.

"It is certain that the intent of the charter is that these policemen shall be subject to the orders and direction of the common council, and that such council has the power at any time to remove them."

This case was referred to in the later case of *Trainor* v. *Board of Auditors*, 89 Mich. 162 (50 N. W. 809, 15 L. R. A. 95). While this latter case says that a policeman in the city of Adrian is not a public officer, referring to *Attorney General* v. *Cain, supra,* it must be said that this decision goes only to the extent of holding that, since in that city policemen were removable by the council at pleasure, it would be use-

less for the attorney general to institute proceedings to determine who was entitled to the position. Under these circumstances, it was not such an office as would authorize the attorney general to file an information by *quo warranto* in this court to test the title to the position.

Being satisfied that a policeman is an appointive officer under the provisions of the charter of this city, required to take an official oath of office, which it appears was done in this case, it follows that he came within the exception in subdivision 1, § 7, pt. 1, Act No. 10, Public Acts 1912 (Extra Session), (2 How. Stat. [2d Ed.] § 3945), and is not an employee, as defined by said act, and therefore does not come within its provisions. Any effort to enlarge the scope of this act should be addressed to the legislature.

The decision of the Industrial Accident Board will be reversed and the claim of the applicant is disallowed.

BROOKE, C. J., and McALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.