AMELIA M. HARRIS *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*Workmen's Compensation—Police Officer Not Employee.*

A park policeman employed by the Park Board of Baltimore City is an officer, and not a "workman employed for wages" within the meaning of Code, art. 101, sec. 35, and is consequently not within the scope of the statute.

*Decided June 10th, 1926.*

Appeal from the Superior Court of Baltimore City (ULMAN, J.).

Claim by Amelia M. Harris against the Mayor and City Council of Baltimore City and the Park Board of Balti-

more City, under the Workmen's Compensation Act. From a judgment confirming the order of the State Industrial Accident Commission denying the claim, the claimant appeals. Affirmed.

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Shirley Carter* and *Philander B. Briscoe,* with whom were *Briscoe & Jones* on the brief, for the appellant.

*Charles C. Wallace, City Solicitor,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

John E. Harris, aged seventy-three years, was on June 29th, 1925, employed by the Park Board of Baltimore City as a park policeman under the authority conferred by sections 97 and 98 of the Revised Edition of 1915 of the Baltimore City Charter, which read as follows:

"97. The said Board of Park Commissioners shall have full power to employ and compensate all persons whom, in its judgment it may deem proper, in maintaining and supporting such parks, etc. * * *

"98. The night watchman employed by the Board of Park Commissioners shall have, while on duty, the same powers that police in said city have as conservators of the peace."

While on duty, clothed in the uniform of a park policeman, and in the act of crossing a road in Druid Hill Park, he was on that day struck by an automobile, and so badly injured that he died on the 3d of July following.

On the tenth of July Amelia M. Harris, his widow, filed with the Industrial Accident Commission a claim for compensation against the Mayor and City Council of Baltimore City on the ground that he was injured in the course of his duty as an employee of that corporation engaged in an extra-hazardous occupation. The claim was resisted by

the city and it prayed the commission to hear and determine
these issues:

> "1.   Whether or not the above claimant sustained
> an accidental injury, arising out of and in the course
> of his employment by the Mayor and City Council of
> Baltimore.

> "2.   Whether or not the Mayor and City Council
> of Baltimore was engaged in any extra-hazardous work
> in maintaining its public parks.

> "3.   Whether or not the deceased was a workman
> employed for wages, within the meaning of article 101
> of the Annotated Code of Maryland."

A hearing was had, evidence taken, and at its conclusion,
the commission decided that the injury arose out of and
in the course of the decedent's employment, and that such
employment was extra-hazardous, but that he was not a
workman employed for wages within the meaning of article
101 of Bagby's Code P. G. L. of Md., and it accordingly
denied the claim.   From that order the claimant appealed
to the Superior Court of Baltimore City, where in due course
the appeal was heard.   At that trial the record from the
commission was read to the jury and, while no additional
evidence was taken, counsel for the parties stipulated that
"the decedent was employed by the Park Board of Balti-
more City, under the general authority given in section 97
of the Charter of Baltimore City, Revised Edition 1915,
and particularly by virtue of section 98 of said Charter."
At its conclusion the defendant offered three prayers, all of
which were granted.   The first prayer was a general de-
murrer to the evidence; the second ruled as a matter of law
that the decedent was not a "workman employed for wages"
within the meaning of the Workmen's Compensation Act,
and the third decided as a matter of law that the Park
Board was not engaged in extra-hazardous work within the
meaning of the act in maintaining Druid Hill Park, and
upon that issue reversed the decision of the commission.   In
accordance with those instructions a verdict was returned

for the defendant, upon which in due course a judgment was entered, and from that judgment the claimant has appealed to this Court. The only exception presented by the record relates to the court's rulings on the three prayers to which we have referred, and it submits these questions, (1) Is a "park policeman" employed by the Park Board of Baltimore City an officer, or is he a "workman employed for wages?" (2) If he is a workman employed for wages are his duties extra-hazardous?

In addition to what has been stated, the evidence, which was undisputed, showed that the claimant was entirely dependent on the decedent for her support and "that decedent was equipped, while on duty, with a uniform and a kind of espantoon; that the decedent's uniform was the same as an everyday policeman, except the color of the uniform was gray instead of blue; that decedent's duties were the same as a city policeman within the park jurisdiction; * * * that these park policemen are on duty twelve hours a day, seven days a week, and are employed for either night or day duty and are interchangeable, 'shift the same man in night or day duty the same week or month, it depends on circumstances'; that the park police arrest for violation of law in the parks, * * * but city policemen are an entirely separate force and decedent was employed exclusively by the Park Board, so far as witness (James V. Kelly, secretary to the Park Board) knows; that the Park Board is authorized to employ, by statute, all men necessary to look after the parks and that includes carpenters, workmen, stablemen and all types of workmen in the park."

It having been conceded that the decedent was injured while he was on duty, and it appearing from the evidence that the accident occurred at a place and under circumstances sufficient to warrant the inference that it arose out of and in the course of his employment, the propriety of the court's action in granting the defendant's first prayer, withdrawing the case from the jury, necessarily depends upon the soundness of the proposition involved in the de-

fendant's second prayer, which was granted, and upon whether the occupation in which the decedent was engaged, when he was injured was extra hazardous.

For in granting the third prayer the court ruled that the defendant in "maintaining Druid Hill Park" was not engaged in "an extra-hazardous work" within the meaning of the Compensation Act. That prayer was wholly collateral to the real question involved, which was not whether the entire business of maintaining that park was extra-hazardous, but whether the particular work which the decedent was called upon to perform was extra-hazardous, and as that question was not presented by the prayer it was meaningless, and should not have been granted, although it is not apparent how it could have injured the appellant. But as the character of the employment may be involved in the ruling on the first prayer, that question must also be considered. We do not understand the defendant's contention to be that hazards and danger are not natural and inherent in the employment in which the decedent was engaged, nor could such a contention be sustained if made. Because not only did it expose him to dangers incident to the protection of the city's property, the suppression of disorder, the arrest and custody of violent and reckless persons engaged in violating the law, but necessarily it required him to traverse, cross, and patrol, at all hours of the day and night, roads and drives constantly used for the large volume of traffic usually found in such a park in a great city. But the defendant's contention is rather that it was not an extra-hazardous "employment" or "work" within the meaning of the act, because decedent was but an agent of the municipality engaged in the performance of a purely governmental function. And since that is but another way of stating the proposition submitted by the defendants second prayer, we will consider it in connection with that prayer, and the question presented by the prayer and that contention is, as we have stated, whether a park policeman, employed by the Park Board of Baltimore City, is a workman em-

ployed for wages within the meaning of the act, or an officer, and without its scope.

Under the terms of the statute the mere fact that the decedent was employed by a municipality does not decide the question, for it expressly provides (section 35, article 101, Bagby's Code):

> "Whenever the State, county, city or any municipality shall engage in any extra-hazardous work, within the meaning of this article, whether for pecuniary gain or otherwise, in which workmen are employed for wages, this article shall be applicable thereto. In time of peace and while engaged in military service all officers and enlisted men of the organized militia of the State of Maryland shall be deemed workmen of the State for wages within the meaning of the preceding sentence. Whenever and so long as by state law, city charter or municipal ordinance provision equal or better than that given under the terms of this article is made for municipal employees injured in the course of employment, such employees shall not be entitled to the benefits of this article."

But it is nevertheless necessary before the claimant can recover that it affirmatively appear that at the time decedent was injured he was a "workman employed for wages" by the appellee. That he was not a "workman" in the usual and popular sense of that word seems to be plain enough, because it is ordinarily used and understood as designating one engaged in some form of manual labor, skilled or unskilled (*Words and Phrases,* 1st and 2nd Series; *Webster's Dictionary*), and to extend its meaning so as to include the occupation of a policeman would be to give it an unnatural and strained construction, which could not be justified unless required by the context in which it is used, or to give effect to a clearly manifested intention. It is true that in *Todd v. Easton Furniture Company,* 147 Md. 352, it was held that the occupation of a watchman was within the terms of the act, but in that case the Court

was dealing not with section 35 of article 101, which refers to "workmen," but with section 32, which deals with "employees," and as the decedent referred to in that case was undoubtedly an employee, there was no question but that the act applied. The two words, "workman" and "employee" are often used interchangeably and as having the same meaning. In a sense, and as applied to certain cases, they do mean the same thing, although they are not synonymous and cannot properly be used interchangeably in all cases. A "workman" may or he may not be an "employee," for he may be working as an independent contractor or for himself, and an "employee" may or he may not be a "workman," for a physician, a lecturer, or a newspaper reporter may be employed to render services peculiar to their several vocations, but they are not "workmen" according to the usual and accepted meaning of the word. Section 32 of article 101 of the C. P. G. L. of Md. extended the application of the statute to all "employees" engaged in extra-hazardous "employments" for private employers, so that whether the service rendered by Todd could properly be classified as "work," there was no possible doubt that it was an "employment," and for a private employer, and so within the express and literal language of the act. But in this case we are dealing with a section which imposed upon the State and certain governmental subdivisions thereof duties and obligations which would not have rested upon them at all but for that section (28 *Cyc.* 1257), in so far as those duties and obligations involved the exercise of their public governmental functions. We would not under those circumstances be justified in giving to the section a meaning broader than the lexical and usual significance of its language would convey, unless constrained to such a construction by the plain and obvious intent of the whole act. But we find no such intent. There was obvious reason why the municipality, in respect to certain work, should be within the act, because as to work of a private character, or certain public work such as the construction and repair of high-

ways, and other works of public improvement, either by
statute or the common law, they were under the same lia-
bility to their employees for their torts as private employers.
In such cases both the municipality and its employees
suffered from the same mischief which led to the passage
of the act for the benefit and relief of private persons and
their employees. But that was not true in respect to agents
employed by the State or subdivision thereof to perform
functions essentially public and governmental, because in
such cases no such liability existed. And when the Legis-
lature, in extending the scope of the act to persons in the
employ of the State and its several political subdivisions,
expressly limited its application to those cases in which
"workmen were employed for wages," it expressed no intent
either in section 35 or the other sections of the act to have
it apply to cases in which liability had never theretofore
existed. If it had intended to embrace such agents as
policemen, and all other persons engaged in extra-hazardous
employments for municipalities, it would certainly have ex-
pressed that intention in clearer language than that which
we have quoted. That expression must have been intended
in some way as a limitation, or it would not have been used.
For if it had been intended that the extra-hazardous char-
acter of the work should be the test of the application of the
act, there was no reason why any agent engaged in any
capacity in the performance of extra-hazardous work of any
character for the city should have been excluded from its
operation. And as municipal agents not included within
the act are excluded from it, the apparent meaning of the
expression "workmen employed for wages" is to exclude
from it all such agents as are not, in the ordinary lexical
meaning of the words, "workmen employed for wages."

But assuming as we must that decedent was employed
exclusively as a policeman and that his duties were the
same as a city policeman in the "park jurisdiction," aside
from that distinction the decedent whose injuries are the
basis of the claim in this case was more than a mere watch-

man; he was by the authority of the Legislature of the State a conservator of the peace, empowered to make arrests, charged with the duty of enforcing the laws both of the City of Baltimore and the State of Maryland, of preserving the public peace, and of protecting the rights of persons and property. He was clothed while on duty with all the powers of the police of Baltimore City, as conservators of the peace, and was permitted by law to exercise a part, and no unimportant part of the sovereignty of the State. Sections 95, 97, 98, 744, article 4, Code P. L. L. of Md. He was indeed designated in section 98, *Ibid.*, as a "night watchman" and "employed" by the Park Board under a general power authorizing it to employ and compensate such persons as it might deem proper to maintain the parks under its control. But the maintenance of the parks under the control of the Park Board necessarily included the protection of the public who visited them, the control of traffic therein, the preservation of the public property, and the suppression of violence and disorder, and however the agents employed by them to discharge those highly important duties and functions may be designated, they can only be regarded as police officials exercising within the parks of Baltimore City a part of the police power of the State, and not as "workmen" within the meaning of section 35 of article 101, C. P. G. L. of Md. In determining whether one engaged in such an occupation is an "officer," an "official," or an employee within the meaning of such an act, many tests have been employed. For instance, it has been held that such status depended on whether the incumbent was employed by contract or "appointed," whether he took an oath of office, or whether he gave a bond, but perhaps the most reasonable test is that stated in *Uffert v. Vogt,* 65 N. J. L. 377, where it is said: "The duties to be performed, not the mode of appointment, constitute the test of his being a public officer. Is he invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from sovereign authority?

If so, his office is a public office, and his relation to the government is, in no sense, a contractual one." And that conclusion is supported at least by the great weight of authority, and our attention has been called to no case construing a statute like that under consideration, in which it has been held that one discharging the duties required of the decedent and exercising the power reposed in him by law was a "workman" within the meaning of such an act. For instance, in the case of *Fahler v. City of Minot,* 49 N. Dak. 960, where it was held that a policeman was embraced within a Workmen's Compensation Act, the court was dealing with a statute which in terms applied to all "employees" and defined "employees" as meaning every person engaged in a hazardous employment under any appointment or contract of hire. And in *Board of County Road Com'rs. v. Southern Surety Co.,* 216 Mich 528, cited by appellant, and the nearest case in point, in allowing compensation to a "special officer" under a Workmen's Compensation Act, the court rested its decision on the fact that it did not appear that the municipality appointing him had any power to appoint police officers. Such cases are in no sense in conflict with the conclusion which we have stated, and which is supported and illustrated by a number of cases collected in a note to *McDonald v. City of New Haven,* 10 A. L. R. 201. To illustrate the application elsewhere of these principles we will refer to several of the later cases in which they have been recognized.

In *Johnson v. Pease,* 126 Wash. 163, the question was whether a fireman employed by a municipality injured through the negligence of a third person while on his way to put out a fire was a "workman employed for wages," and the court in that case held that he was not to be considered an "employee of a city * * * but a public officer and engaged in a governmental duty."

In *Hall v. City of Shreveport,* 157 La. 589, the question was whether a policeman was an "employee" or an "official," and in dealing with that question the court said: "And there

is no end of authority that a policeman is a public officer holding his office not under a contract between himself and the municipality, but as a trust from the State. * * * The police officers of a city are not regarded as servants or agents of the municipality. They are conservators of the peace, and exercise many of the functions of sovereignty; they are appointed and paid by the municipality as a convenient mode of exercising the functions of government; they assist the city in the performance of its governmental duties, and not in the discharge of its proprietary obligations. And the municipality is not responsible for their unlawful or negligent acts in the discharge of their duties."

In *Mann v. City of Lynchburg,* 129 Va. 453, in considering the question of whether a policeman was an employee within the meaning of a workmen's compensation statute, it was said: "The statute is to be liberally construed to the end that its wise and humane purpose may be advanced; but we cannot extend its provisions by construction, so as to cover persons or occupations not within its scope or intent. * * * It is no longer open to question in this state that a policeman is a public officer. See *Burch v. Hardwick,* 30 Grat. (71 Va.) 24, 32 Am. Rep. 640; *Smith v. Bryan,* 100 Va. 199, 40 S. E. 652; *Sherry v. Lumpkin,* 127 Va. 116, 102 S. E. 658. And this is the holding generally in other states. See *Blynn v. Pontiac,* 185 Mich. 35, 151 N. W. 681, 683; *Griswold v. Wichita, supra.* The act in question, as we have seen, is limited to persons in service of the state or city under a contract of hire. A public officer does not perform his duties under contract, express or implied, but by virtue of the law creating the office. His compensation is a matter of statute or ordinance, and does not depend upon the amount or value of the services performed, but is incident to the office. Unlike an employee working under contract, an officer acquires no vested right to have the office continued during the time for which he is elected or appointed, since the authority creating the office may abolish the same during the term of the incumbent, or change the compensation and the duties to be performed. The following author-

ities may be cited as sufficient in support of the foregoing propositions: *Booker v. Donohue,* 95 Va. 359, 363, 28 S. E. 584; *Nichols v. MacLean,* 101 N. Y. 526, 533, 5 N. E. 347, 54 Am. Rep. 730; *Mechem on Public Officers,* sections 463, 855; *U. S. v. Hartwell,* 6 Wall, 385, 393, 18 L. Ed. 830; *Hall v. Wisconsin,* 103 U. S. 5., 26 L. Ed. 302."

And in *Devney's Case* (1916), 223 Mass. 270, the question was whether a fireman was a laborer, workman, or mechanic, within the meaning of a workmen's compensation act allowing compensation to "laborers, workmen and mechanics" employed by cities and towns, and in deciding that question the court held: "If when extending the compensation act it also was the purpose to include all persons of whatever rank serving in the various municipal departments, plain and unambiguous terms should have been used showing the change and enlargement. A 'laborer' ordinarily is a person without particular training who is employed at manual labor under a contract terminable at will, while 'workmen' and 'mechanics' broadly embrace those who are skilled users of tools. *Oliver v. Macon Hardware Co.,* 98 Ga. 249; *Ellis v. United States,* 206 U. S. 246; *Breakwater Co. v. United States,* 183 Fed. 112, 114, 105 C. C. A. 404. Compare *State v. Ottawa,* 84 Kan. 100."

. The appellant contends that, because section 35, article 101, C. P. G. L. of Md., extends the operation of the act to officers and enlisted men of the organized militia of the State, that it thereby enlarges the meaning of the word "workmen," but we cannot so regard it, for the Legislature obviously used that language for the sole purpose of bringing within the act a class of persons who would not otherwise be affected by it, if its language were given its ordinary and accustomed meaning.

It is also contended that the decedent cannot be regarded as an officer or an official because his occupation as a park policeman did not constitute an office which would continue to exist whether it was occupied or not, and that the test of whether a given duty or occupation constitutes an office

is whether it will continue to exist by force of law, after it has become vacant. But that contention is in our opinion too technical and refined, first, because the Legislature, when it defined the powers and duties of "night watchmen" employed by the Board of Park Commissioners, did create an office which continues to exist irrespective of whether it is occupied, and under the express direction of the Legislature, as soon as it is filled, the powers and duties thus defined fasten themselves upon the incumbent. And again, it would seem like juggling with terms to hold that a police officer of Baltimore City is an official (and that conclusion hardly seems open to question), but that a park policeman, exercising within the confines of the public parks precisely the same powers, and charged with similar duties, is not an official. And finally, if the contention of the appellant is correct, and the city occupies the same relation to the decedent that a private employer would to a watchman employed to guard his property, it would follow that it would also be responsible to persons injured by his wrongful acts or neglect, although it is apparent that that could not be so, because the powers and duties of park policemen as conservators of the peace are fixed not by the park commissioners, who have no control over such powers, but by the Legislature of the State, which created them, for while the commissioners appoint the park policemen their powers and duties as conservators of the peace are fixed by statute.

It is also obvious, from an examination of the history of the statute, that it was never intended to embrace such occupations as that in which the decedent was engaged, but that its purpose was to protect employers and employees engaged in industrial, commercial, and other enterprises requiring manual labor, from the waste and loss occasioned by hazards inseparable from their operation, by affording to the employee or his dependents definite and certain compensation for disabling injuries, and to the employer protection against a constantly swelling volume of litigation,

growing out of accidents to persons employed in industrial occupations.

The preamble to chapter 800 of Acts of 1914, in which section 34 (now section 35), article 101, Bagby's Code, appears in this form:

> "Whenever the State, county, city or any municipality shall engage in any extra-hazardous work within the meaning of this act in which workmen are employed for wages, this act shall be applicable thereto. Whenever and so long as by state law, city charter or municipal ordinance, provision equal or better than that given under the terms of this act is made for municipal employees injured in the course of employment, such employees shall not be entitled to the benefits of this act,"

compels that conclusion. For that preamble in part declares:

> "The State of Maryland recognizes that the prosecution of various industrial enterprises which must be relied upon to create and preserve the wealth and prosperity of the State involves injury to large numbers of workmen, resulting in their partial or total incapacity or death, and that under the rules of the common law and the provisions of the statutes now in force an unequal burden is cast upon its citizens, and that in determining the responsibility of the employer on account of injuries sustained by his workmen, great and unnecessary cost is now incurred in litigation, which cost is borne by the workmen, the employers and the taxpayers, in part in the maintenance of courts and juries to determine the question of responsibility under the law as it now exists. * * * Whereas, the common law system governing the remedy of workmen against employers for injuries received in extra-hazardous work is inconsistent with modern industrial conditions; and injuries in such work, formerly occasional, have now become frequent and inevitable."

And the only changes in section 35, originally enacted as section 34 of that act, are by chapter 303 of the Acts of

1922, by which the words "whether for pecuniary gain or otherwise" were added to the expression, "engage in extra hazardous work" etc., as found in the Act of 1914, and by chapter 332 of the Acts of 1924, which extended the act so as to embrace the state militia.    But neither of those amendments changed the meaning or the purpose of the original Act of 1914, so as to extend it to occupations not involving the performance of manual labor, except in the single case of the state militia.    It certainly never occurred to the Legislature, when the Act of 1914 was passed, that a policeman, or a fireman, serving the State or a municipality or a member of the state militia, was a "workman employed for wages" in the sense that an employee in a steel mill, or a coal miner, would be, and the act was not in our opinion intended to apply to employees of the State or a municipality engaged in such occupation.    And it does not appear from any amendment to the original act, or from any source, that the Legislature has ever extended or widened its scope except in the specific instances to which we have referred.

For these reasons, without further discussion, it is sufficient to say that in our opinion the Workmen's Compensation Act, in its present form, does not embrace the occupation in which the decedent was engaged when he was injured, and that the first and second prayers of the defendant asserting that proposition were properly granted.    The judgment appealed from will therefore be affirmed.

*Judgment affirmed, with costs.*