## GRACE L. HART *v.* SEALTEST, INC.

[No. 95, October Term, 1945.]

184

*Decided March 15, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Maurice J. Pressman,* with whom were *Louis M. Silberstein* and *William Saxon* on the brief, for the appellant.

*Jesse Slingluff, Jr.,* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

The appellant was employed in August, 1937, as a research librarian for the appellee at the latter's research laboratory at 1403 Eutaw Place, at the corner of Lafayette Avenue in the City of Baltimore. This laboratory was maintained for the purpose of dairy research, improvement of milk products, and for the development of by-products of milk. Appellant, who is 33 years old and who is a college graduate, was paid $1,500 a year (later increased to $2,300) to take charge of the library on the first floor. The building, which was a converted residence, consisted of a basement and two floors. In the basement was the furnace room and the dairy technological laboratory. On the first floor, in addition to the library, were the main office in the front room and a small office next to it. All of the rooms on the first floor opened into a hall with a stairway leading to the second floor. On the second floor was located the analytical chemical laboratory in the front room; the by-products laboratory in the middle room and the cereal or bakery laboratory in the rear. The room in which appellant was employed was 15′x22½′, with a high ceiling, about 12′-14′, with five windows, two on Lafayette Avenue and three in the rear. Appellant stated that her duties in general were to "try to throw together a library and at the same time, to try to hunt up the literature on various projects." She prepared bibliographies, tried to find out everything on a particular subject from publications, tried to pick up cross-references, and sometimes obtained books from other libraries for the men in the various laboratories, which occasionally she took to the laboratories. The whole building was an experimental laboratory of the appellee and included chemical, bacteriological and dairy technological divisions. Odors and smells from the various chemical experiments permeated it all the time.

In the fall of 1942, experiments were begun in the by-products laboratory with a chemical known as methyl-acrylate, made out of milk and sugar. This chemical is a solvent type—that is, it is an organic liquid that has a

solvent property for other materials. The object of the experiments with it was to combine it with other chemicals to see if synthetic rubber could not be made out of it. This chemical had a very bad odor and as soon as it began to be used, this odor went all over the building, even down to the basement. The fumes were heavy, pungent, acrid and appellant said they were nauseating. They were heavier than air, and very slow to disburse, and the appellant said they centered around her desk in the library.

There were six or seven people working on this particular experiment. The fumes affected the appellant, first by giving her a skin rash on her face and ears, which she said would calm down on week ends when she was away from the library, and then would start again when she returned. She complained about it and apparently the other people in the building were complaining too, although none of them was affected as she was. Upstairs, the other laboratories were boarded off and the doors were ordered closed. The chemists employed in the by-products laboratory used hoods and some of them occasionally had to go out and walk in the fresh air to get rid of the effects of the fumes. Appellant began to feel ill in December, 1942, or January, 1943. Her eyes became irritated, she had sinus trouble and developed some sort of spells of coma which occurred at more and more frequent intervals. She lost control of her extremities, had a tired feeling and some fainting spells. She went to see her physician. He order her to take a week off. When she told her employers about this, and took the time off, she was advised that they were going to do something about the situation. They did put some ventilators in, but the fumes were not cleared up, and finally, in July, 1943, appellant resigned. She was then suffering from toxic poisoning, caused by the fumes, and is probably permanently affected by it. She has attacks of melancholy and spells of interrupted consciousness, and has to take large doses of benzedrine sulphate daily, as a stimulant, in order to carry on any work.

When appellant lost ten days from work in March, 1943, on account of this condtion, the Travelers Insurance Company, which carries the appellee's compensation insurance, paid her one week's compensation of $10, securing a receipt from her, and got her to file a claim for compensation with the State Industrial Accident Commission. The appellee filed an employer's report. No award was made by the Commission, and, before further proceedings were held, appellant withdrew her claim and brought a common-law action in the Baltimore City Court. Appellee filed special pleas, alleging that dangerous and toxic chemicals were used and that irriating and toxic fumes and odors permeated the premises at Eutaw Place. The basis of these pleas was that appellant was engaged in an extra-hazardous occupation and that her exclusive remedy was under the Workmen's Compensation Law. Code 1939, Art. 101, Secs. 1 *et seq.* Demurrers to these pleas were sustained, however, and the case was tried on general issue pleas and appellant got a verdict for $5,000. A judgment for the appellee *n. o. v.* was subsequently entered, and, from this judgment, the appeal comes here.

The primary question in the case is whether appellant was engaged in an extra-hazardous occupation. Appellee claims that she was. It also contends that, if she was not, she is bound by the common-law rules, and, as the acts of negligence claimed, that is the flooding of the premises with the fumes which caused her injuries, were the acts of her fellow servants, she cannot recover against the appellee. A further question is whether she had an election of remedies and if so, whether she did not elect to proceed under the Workmen's Compensation Law, and, therefore, was barred from bringing the subsequent suit.

The first of these questions, namely, whether or not appellant was engaged in extra-hazardous employment, was decided in the negative in the ruling on the original pleas by Judge Frank, and his decision was followed by Chief Judge Dennis of the Supreme Bench, when similar amended pleas were filed. Chief Judge Smith stated in

his oral charge to the jury that if appellant was employed as a librarian, she was not engaged in extra-hazardous employment. In his opinion on the motion *n. o. v.*, he treated this question as settled, and decided against the appellant on the ground that she had not shown any negligence on the part of the appellee. He held that the offensive chemical was not shown to be a substance dangerous to human life or liable to cause serious bodily harm, and he found that appellant was peculiarly sensitive to the chemical, a fact which was unknown to her and unknown to her employer, as well. He concluded that there was no basis for a finding that the appellee should have taken greater precautions than it did, in the present state of scientific knowledge with respect to methyl-acrylate.

Extra hazardous employment is defined in Section 33, Article 101 of the Annotated Code. Forty-five special activities are listed and then, by Subsection (46), it is stated "In addition to the employments set out in the preceding paragraphs, this Article is intended to apply to all extra-hazardous employments not specifically enumerated herein and to all work of an extra-hazardous nature." Employment as a research librarian is not specially listed and it becomes necessary, therefore, to determine whether this is extra-hazardous employment and whether the work of such a librarian is of an extra-hazardous nature. It may be noted in the consideration of this question, that under Subsection (25), the manufacture of explosive and dangerous chemicals, corrosive acids or salts, etc., is listed as an extra-hazardous employment and by Subsection (28), the manufacture of drugs, not specified in Subsection (25) and non-corrosive acids of chemical preparations is also listed.

Subsection (46) of Section 33 was considered by this Court in the case of *Mayor and City Council of Baltimore v. Smith*, 168 Md. 458, 177 A. 903. In that case, a nurse at the Baltimore City Hospitals was putting clean linen on the bed of a patient and scratched her left hand on the spring of the mattress, whereby her finger became infected and she claimed compensation. From an examina-

tion of the Workmen's Compensation Act, the Court determined that unless otherwise specifically provided, the Act applied to employment in an industrial enterprise and that as a hospital was not an industrial enterprise, a nurse is a professional, not a manual or industrial worker. The manual labor required of her was said to be merely incidental to her profession, and therefore, she was not compensable under the Act.

In the case of *Mayor and City Council of Baltimore v. Trunk*, 172 Md. 35, 190 A. 756, the claimant was a head orderly in the Baltimore City Hospitals, and his regular work included the doing of manual labor. He was injured while engaged in moving a heavy steel locker. The Court said that he was not engaged in work associated with any of the classes of hazardous employments enumerated in the first forty-five subsections, and since the work of an orderly in a hospital was neither specially named nor included by fair implication, he was not engaged in work of an extra-hazardous nature, within the meaning of the compensation law.

In the case of *Stout v. Baltimore Life Insurance Co.*, 173 Md. 277, 195 A. 547, an industrial life insurance agent was killed by a railroad train while stopping to make an entry on a card in the performance of his duty. The contention was made that he was engaged in work of an extra-hazardous nature, because Subsection (43) covers salesmen employed to solicit orders outside of the establishment for which they are employed. The Court said a life insurance agent was not a salesman.

In the case of *Mayor and City Council of Baltimore v. Schwind*, 175 Md. 60, 199 A. 853, a janitress in public school claimed to have been injured while moving a ladder and the question, under amendments to Article 101, was whether the municipality was engaged in any extra-hazardous work in the maintenance of public schools. The Court had previously indicated in *Harris v. Mayor and City Council of Baltimore*, 151 Md. 11, 133 A. 888, that did not mean that all the work of a particular municipality was extra-hazardous, but only that part of it in which

the claimant was injured. The Court held that the school janitress was not engaged in extra-hazardous employment, as the school was primarily an educational institution.

In the case of *Mattes v. Mayor and City Council of Balmore*, 180 Md. 579, 26 A. 2d. 390, 392, the claimant was a janitor at the Logan Field Airport. His classification by the City Service Commission was laborer. The officials at the airport considered that he was a laborer, doing janitor's work. He was emptying a large wire basket, gave an unusual pull to get the basket from its place, and strained his back. Janitors are not classified in the Workmen's Compensation Act, and this Court said that to be included, the workman injured "must have been employed incidentally to the promotion or prosecution of the hazardous work." Earlier decisions are quoted and approved, which state that, where the work or occupation of the employee may be partly hazardous and partly non-hazardous, he would be regarded as engaged in an extra-hazardous work if his injury were suffered in connection with his extra-hazardous employment. 2 *Schneider's Workmen's Compensation,* Perm. Ed., Section 396, is quoted to the effect that when an employer carries on a hazardous employment, but has employees engaged in non-hazardous work, they are covered if the non-hazardous work they were performing when injured was incidental to the operation of the hazardous employment. The Court, in that case, held that the work of janitor at the airport was not connected with the promotion of the hazardous work which went on there, and he was denied compensation. It may be noted that in the Mattes case, 180 Md. at page 581, 26 A. 2d. at page 391, the Court said, "The description commonly given the man's position is not decisive, for names may be used loosely. 'The actuality, rather than the appellation, is the sound basis for the Commission's action in determining whether an employee met with mishap in the course of an enumerated employment.' *Gleisner v. Gross & Herberner,* 170 App. Div. 37, 155 N. Y. S. 946, 948."

We are, therefore, not bound in the case at bar by the description of the appellant's employment as that of a librarian or a research librarian, but are to look further to see whether her duties were themselves extra-hazardous, or whether they were incidental to the operation of a hazardous enterprise.

The description of the processes of the appellee in connection with methly-acrylate was given by Dr. Samuel M. Weisberg, who identified himself as "senior chemist in charge of the industrial by-products work." The chemists in the laboratory measured out a certain amount of methyl-acrylate in a flask, then measured some casein from the appellee's milk, and some isoprene, which is a solvent type of material. They then tried to "cream" these ingredients. The methyl-acrylate is made by beginning with curds and whey, fermented with a buttermilk type of organism, which produces sodium lactic. This is treated in some way with sulphuric acid and methyl-alcohol, which results in methyl-acrylate. This last-mentioned process was not conducted at the Eutaw Place laboratory. Appellee received the methyl-acrylate from what was called its pilot plant, which was located elsewhere. It was admitted that the odor of methyl-acrylate was very bad, and that those working in the experiment had considerable trouble with it, although none of them was injured. However, the experiments continued because as Dr. Weisberg said, "The Production Board said that they wanted rubber and my duty was to experiment on how to make it."

It must be conceded that appellee was engaged in an industrial occupation. Judge Parke, in the case of *Mayor and City Council of Baltimore v. Smith*, 168 Md. 458, 177 A. 903, 904, earlier referred to, examined the enumerated employments in Sec. 33 (then Sec. 32), "to ascertain the criteria by which a work or employment is declared to be extra-hazardous." He divided the listed industries into six general and approximate classifications, one of which, the third, included mining, lumbering, quarrying, and other methods of production of raw material, its prepara-

tion for use, and its manufacture for the purposes of trade, commerce, and consumption. The appellee in the case before us was certainly preparing raw material for use in the manufacture of rubber for the purposes of trade, commerce, and consumption. The determination of how to do this in a laboratory was equally as hazardous, if not more hazardous, than its manufacture on a large scale after the experimental stage had been completed. We cannot doubt that any employee who was actually engaged in the experiment in the laboratory, would be engaged in an extra-hazardous employment.

The hazard in appellant's position is only slightly more remote. The difference is in degree and not in the nature of the work. Her own employment in looking up articles on this new liquid and making investigations for the chemists, might not of itself be extra-hazardous, although it could be said that anyone employed in an experimental laboratory where all sorts of experiments might conceivably be tried, with possible dangerous results, is engaged in hazardous work. However, we do not have to go that far in this case, because not only did Miss Hart's duties require her occasionally to go into the laboratories where the experiments were being conducted, but the fumes from these laboratories and from the by-products laboratory in particular, spread all over the whole building, even affecting the director in his office in the basement, and it was so impossible for them to be completely shut out, that eventually that part of the laboratory conducting the experiments with methyl-acrylate was moved elsewhere. The employment of the appellant, whether hazardous or non-hazardous, was incidental to the promotion or prosecution of a hazardous work and we find that she was covered by the Workmen's Compensation Act. This Act was formerly limited to those whose salary was not in excess of $2,000 a year (Act 1914, Ch. 800, Sec. 62 (3), but this limitation was left out in the re-enacting Act of 1922, Ch. 303, Code, 1939, Art. 101, Sec. 80 (3).

This being the case, the Workmen's Compensation Act substitutes for the common law liability of the appellee for negligence, subject to common law defenses, an absolute, but limited, liability regardless of fault, and makes that liability exclusive, in the case of a conforming employer. Code, Art. 101, Sec. 14; *Baltimore Transit Co. v. State,* 183 Md. 674, 39 A. 2d 858.

In view of our conclusion, it becomes unnecessary to consider the other questions raised by the appellee. The judgment *n. o. v.* should have been entered, not for the reasons assigned by Chief Judge Smith (who considered himself bound by the earlier decision of Judge Frank), but on the ground indicated, that the appellant had her remedy under the Workmen's Compensation Act, and therefore, could not proceed against her employer in a common-law action.

Some concern was expressed by appellant's counsel that, if such a decision should be made by us, appellant would be barred by lapse of time from proceeding before the Commission. Appellee's counsel, who was the counsel for the insurance company (although he was not representing the latter before us) stated at the oral argument that no defense on this ground would be made. We do not assume to say whether any such defense can be interposed to a proper complaint, filed now, by the appellant, but irrespective of that, it is our duty to decide the case according to what we find to be the law. If the appellant is thereby precluded from any remedy, it will be unfortunate, but it cannot be helped.

*Judgment affirmed, with costs.*