# BARRY R. BERKEY v. GREGORY E. DELIA

[No. 15, September Term, 1979.]

*Decided March 26, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, ORTH and COLE, JJ., and reargued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and RODOWSKY, JJ., and EDWARD O. WEANT, JR., Associate Judge of the Court of Special Appeals, specially assigned.

Argued by *William A. Ehrmantraut,* with whom were *Donahue, Ehrmantraut & Montedonico* on the brief, and reargued by *Henry Kenneth Armstrong* for appellant.

Argued and reargued by *Clifford R. Bridgford* for appellee.

SMITH, J., delivered the opinion of the Court. ELDRIDGE and COLE, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 333 *infra,* in which COLE, J., concurs.

Respondent, Gregory E. Delia, a Prince George's County police officer, sued petitioner, Barry.R. Berkey, in libel and slander. The bases of the suit were a letter Berkey had directed to Delia's superior and statements Berkey had made in the resultant investigation. The Circuit Court for Prince George's County read *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), as requiring it to grant Berkey's motion for summary judgment. Accordingly, it entered judgment for Berkey. The Court of Special Appeals reversed in *Delia v. Berkey,* 41 Md. App. 47, 395 A.2d 1189 (1978), remanding the case to the trial court for further proceedings. We granted Berkey's petition for the writ of certiorari in order that we might consider the issues here presented. We shall affirm.

I

Before relating the facts we shall set forth the law relative to summary judgment in order that the facts may be read in the context of those requirements.

Under Maryland Rule 610 d 1 summary judgment is to be rendered forthwith "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." The function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to determine whether there is a dispute as to a material fact sufficient to provide an issue to be tried. *Peck v. Baltimore County,* 286 Md. 368, 410 A.2d 7 (1979); *Honaker v. W. C. & A. N. Miller Dev. Co.,* 285 Md. 216, 231, 401 A.2d 1013 (1979); *Dietz v. Moore,* 277 Md. 1, 4-5, 351 A.2d 428 (1976), and cases there cited. All

inferences must be resolved against the moving party when a determination is made as to whether a factual dispute exists. This is true even if the underlying facts are undisputed. *Peck,* 286 Md. at 381; *Honaker,* 285 Md. at 231; *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 217, 339 A.2d 664 (1975); *James v. Tyler,* 269 Md. 48, 53-54, 304 A.2d 256 (1973); *Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 14, 155 A.2d 691 (1959); and *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). We have observed that the function of the trial judge on such a motion is much the same as that which he performs at the close of all the evidence in a jury trial when a motion for a directed verdict or a request for peremptory instructions makes it necessary that he determine whether an issue requires resolution by a jury or may be decided by the court as a matter of law. *Honaker* at 232, citing *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979). In *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970), cited in *Peck, Honaker* and *Porter,* we said, "[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact."

Although summary judgment was approved in that particular case, in *Driver v. Potomac Electric,* 247 Md. 75, 79, 230 A.2d 321 (1967), Judge Horney observed for the Court, "Usually it is neither advisable nor practicable to enter a summary judgment in a tort action . . . ." Professor C. Christopher Brown of the University of Maryland School of Law states in his recent *Summary Judgment in Maryland,* 38 Md. L. Rev. 188 (1978):

> Because of the seriousness and frequent complexity of the issues posed by constitutional questions, the need for a full and complete factual hearing often precludes summary judgment in constitutional cases. In *Lawrence v. State Department of Health,* [247 Md. 367, 373, 231 A.2d 46 (1967),] for example, the Court of Appeals upheld the denial of summary judgment and warned that "[c]onstitutional issues

are generally not to be decided on mere conclusions of the pleadings." When the circumstances allow, however, summary judgment is appropriate in these cases as well. Cases that primarily raise issues of fraud or intent are also generally ill suited for summary judgment due to the need for greater than usual factual development, but when there is no genuine issue of material fact, summary judgment may be appropriate. [*Id.* at 220-21 (footnotes omitted).]

The Maryland rule on summary judgment was modeled on the federal rule. Thus, it is not surprising that the Supreme Court also has observed that in reviewing a motion for summary judgment the facts must be considered most favorably to the party opposing the motion. *See, e.g., Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 161, n. 5, 99 S. Ct. 2701, 2705, 61 L. Ed. 2d 450 (1979), in the context of a case involving the *New York Times* rule; *Bishop v. Wood,* 426 U.S. 341, 347, n. 11, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976), and *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

## II

As previously indicated, Delia is an officer of the Prince George's County Police Department. Berkey is a psychiatrist. On September 25, 1976, while on uniformed patrol on the Capital Beltway, Delia stopped Berkey, charging him with exceeding the posted speed limit. This litigation grows out of that incident.

The first count of Delia's declaration was in libel based upon the following letter:

**BARRY R. BERKEY, M.D., LTD.**
Boulevard Medical Center
8301 Arlington Boulevard
Fairfax, Virginia 22030

Telephone (703) 573-2944

September 30, 1976

John Rhoades, Chief of Police
Prince George's County
3415 N. Forest Edge Road
Forestville, Maryland

Dear Chief Rhoades:

This is to request an investigation on Private Gregory Delia. The reason for this request has to do with the officer's behavior when he stopped my car by signalling with lights flashing from his patrol car. He asked for my license and automobile registration but gave me *no reason* (until asked); he had high power spot lights directed at my car and upon request, he refused to deflect or turn them off.[1] After writing up the summons, he *refused* to repeat his inaudible instructions and insisted I sign the summons immediately or that he would "take me in." Private Delia kept the high power lights directed into my wife's eyes, my twelve year old son's eyes and my own — while he kept his back toward the beam. (I couldn't identify Private Delia if my life depended on it because of the blinding light).

I regard his behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punative [sic]. I neither look nor behave like a

---

1. In his deposition Delia explained that "a set of high intensity lights is ... mounted ... on the action bar on top of the cruiser." He said that in Montgomery County "they have one light in the center of the car," but "Prince George's has two lights on either end of the bar mounted on top of the cruiser. In the middle of the bar is a speaker for amplification of the siren. Between the two exterior lights, the lights on the ends of the bar and the speaker in the middle are two high intensity lights mounted thereon." He asserted that these lights are generally "angled" toward the front of the police car. Delia said that in this instance the police car was behind Berkey's vehicle.

fugitive, but I, as well as my wife and son, were treated by Private Delia as such.

Partly because of my professional background and training, I question if this young officer is mentally deranged, if he is psychopathic and/or pathologically sadistic. This letter is to formally request a mental evaluation of Private Delia.

My speedometer read 60 mph (not 70 as I was told) and I had been maintaining this speed where safe, since leaving Salisbury, Md.

I shall look forward to your reply.

> Sincerely,
> /s/ Barry R. Berkey
> Barry R. Berkey, M.D.

BRB/mla

cc  The Honorable James Magruder Rea [2]
    Mr. Darryl L. Wyland, Esq. [Emphasis in original.]

The Prince George's County Police Department made an investigation as a result of Berkey's letter. The second count of the declaration is in slander. That cbmplaint is an outgrowth of the investigation. It alleged that "[o]n or about October 21, 1976, . . . Berkey . . . did willfully, intentionally, and maliciously make false and defamatory statements to an investigator for the Prince George's County Police Department that . . . Delia had a 'real emotional problem', and 'should seek professional help', and that [Delia] was 'abnormally cruel and inhumane, rude and insensitive, threatening and punitive.' "

Delia's version of the incident in question is concisely stated in his answer to interrogatories:

---

**2.** The Honorable James M. Rea at that time was the administrative judge of District 5 of the District Court of Maryland, embracing Prince George's County where the alleged traffic violation took place. It is the court of original jurisdiction relative to traffic charges. We were advised at oral argument that Mr. Wyland was the attorney for Berkey. When counsel for Delia took Berkey's deposition Berkey was directed by his attorney not to answer a question as to why he sent the letter to Wyland. Wyland was identified at the deposition as an attorney, but not as the attorney for Berkey.

On September 25, 1976, at approximately 10:45 p.m. while on patrol, southbound on Rt. 495 at Rt. 202, I had occasion to pace a 1973 Plymouth bearing Virginia registration DHX 466. I paced the vehicle at 70 m.p.h. and made a traffic stop on Rt. 495 approaching Central Avenue in Largo, Maryland. When the vehicle pulled to the shoulder of the road, I turned on the high intensity lights and spot light to illuminate the vehicle and approached the operator, Dr. Berkey. I requested the operator's license and registration but before I could explain the reason for the traffic stop, the operator demanded an explanation. I advised Dr. Berkey it was for speeding, for which he would receive a ticket, and again asked for the license and registration. After giving them to me Dr. Berkey told me to put out the lights on my car because they were blinding him. I advised him that the lights were on for both his safety and mine and returned to my cruiser, where I prepared a traffic ticket for speeding — 70 m.p.h. in a 55 mile zone. I then returned to Dr. Berkey's car and advised him that I had issued a ticket for speeding, explained the ticket and the requirement for signing it. Dr. Berkey then asked a series of questions about the ticket and then he said he could not hear me. I repeated the portion which explained his signature, and he took the summons book from me. After he had the book he asked me several questions about the candle power of the lights and began writing across the bottom of the citation. I asked Dr. Berkey not to write on the ticket, but he continued to do so until I advised him to either sign the ticket or face arrest. Dr. Berkey signed the ticket, but began to ask personal questions. I refused to answer the questions, took the ticket book from him, gave him his copy of the ticket and returned to service.

Depositions of Delia, Berkey, Dr. Howard R. Weinreb, and Dr. Brian Crowley are a part of the record. Dr. Weinreb is a psychologist associated with The Potomac Foundation for

Mental Health. Dr. Crowley is a psychiatrist with the same organization.

Berkey was asked "[w]hat specific things [he] re[lied] on in reaching [his] conclusion" that Delia was "inhumane." He responded, "I felt that by keeping the spotlights focused on our car, which contained a twelve-year-old boy, my wife, and myself, for at least ten minutes and probably more would be abnormally cruel and inhumane under the given circumstances, and the manner in which he acted and behaved." In response to a question as to what he intended by the word "psychopathic" in the letter, he replied:

> I meant that somebody who treated me, my wife, and my kid in a very inhumane and cruel way; a person who kept excruciatingly bright spotlights in our eyes for a number of minutes; a person who ordered me not to get out of the car when I had no intention of getting out of the car in the first place; a person who shouted "Look, I don't have all night," or "I don't have all night" — those are the things that I meant when I used the word.
>
> I felt that he acted without a level of common sense, without any concern about our well being, without a sense of allegiance to members of the community at large. All of those components are what I was thinking of when I wrote this letter and used the words that you mentioned.

Dr. Weinreb said of Delia in his written report which is a part of the record:

> *TEST RESULTS:* The picture which emerges from the battery of tests administered is of a man with above-average intelligence and a facile sense of humor, who is emotionally stable, reasonable and appropriate.
>
> He shows no evidence at all of being either deranged, psychopathic or sadistic. On the contrary, he does show evidence of compassion, empathy, and healthy interpersonal skills. He shows no evidence of

organicity, emotional lability, or cognitive dis-
orders, or of any mental aberration.

Intelligence tests reveal Mr. Delia to be performing
within the superior range on most intellectual
functions.

Also filed as an exhibit is a letter to the Deputy Chief of
Police of Prince George's County from Dr. Augusto J.
Esquibel stating that, as requested by the Prince George's
County Police Department, he had conducted a psychiatric
examination of Delia. He said that from the test done by Dr.
Weinreb, a psychological test done by the police psychiatrist,
the report of investigation by Corporal John Calhoon, and
from his personal examination of Delia he found "no
psychopathology which would or could make ... Delia
incompatible for the police force services," adding, "I feel he
is a stable individual and suitable for the function of a police
officer."

Dr. Crowley in his report, likewise filed as an exhibit in the
case, said that the Weinreb "psychological testing and
evaluation" was done at his request. Dr. Crowley
summarized by stating:

[M]y clinical evaluation is that Mr. Delia is a sound,
well balanced, healthy personality, without
evidence of any mental disorder. Our present
comprehensive evaluation reveals no evidence
whatsoever to support the allegation that he is
mentally deranged, psychopathic, or pathologically
sadistic.

Dr. Crowley testified, when Berkey took his deposition,
that he was of the opinion that Berkey made a diagnosis
when he wrote the letter in question. As his reason for this
conclusion, he said:

He certainly used diagnostic language, he used
specific psychiatric diagnostic language, which I
think is tantamount to making a diagnosis. He had
no opportunity for a clinical examination of the

officer and I am sure he was not authorized to release his diagnostic impressions.

* * *

. . . [I]f I were to write a letter to somebody saying, based on my having sat here for an hour, I believe that some of the lawyers in the room are insane or sadistic or schizophrenic, or something like that, I would have crossed the boundaries of propriety, in my view, and I would be engaging in diagnostic labeling under improper circumstances.

At another point in the deposition there was discussion as to whether this was a diagnosis:

Q Why are you of the opinion that Dr. Berkey made a diagnosis when he wrote that letter?

A If I may see the letter again, the terms "mentally deranged," "psychopathic" and "pathologically sadistic" are psychiatric terms with a very heavy emotional impact and they are diagnostic words. If you would ' pardon the expression, I would almost like to say they are diagnostic cuss language, because I think that they are used in that sense here. But there is no question that those terms are psychiatric terms. . . .

Q . . .

But those terms are used in connection with the preface, "I regard his behavior as abnormally cruel," and you are interpreting that sentence as being a diagnosis by a psychiatrist?

A No, sir. He says, "I question if this young officer is mentally deranged, if he is psychopathic and/or pathologically sadistic." Those I think are diagnostic terms.

Q They may be diagnostic terms. But when he says, "I question if," isn't he negativing a diagnosis because he is saying, "I can't say this one way or the other; I question if"?

* * *

[A] No. I would have to go back to my first answer. I think it's inappropriate, very much as I would feel if I wrote a letter saying, "I question if the lawyers in the room are schizophrenic," or, "I question how many of the lawyers in the room are insane." I think that's more than raising a question; it's also making an accusation or an allegation.

Dr. Crowley was asked what steps ordinarily were taken before a psychiatrist offers a diagnosis of anyone, after which the record reveals:

A Well, professionally and ethically the following must occur, in my opinion: There must be an opportunity for a professional examination of the person then to be known as a patient, the doctor must do a professional examination and have access to the opportunity to do one, and then he may not make a diagnostic statement about that person without proper authorization. The proper authorization could come from the patient, his legal representative, or could in certain cases come on compulsion of a court. But without proper authorization, the psychiatrist may not express a diagnostic opinion and he may not express one if he hasn't had the opportunity for professional examination. That requirement was put in the ethics specifically to prevent a type of incident that once occurred in our profession in a rather disgraceful episode.

Q Without the benefit of a mental evaluation or examination and authority from the individual involved, I take it from what you have said a psychiatrist cannot offer a diagnosis of that person?

A No, he may not do it properly. I mean, if he does it he's wrong. If he does it he is professionally wrong and he is ethically wrong.

Q His evaluation would be wrong without a mental examination?

A Yes. Evaluation isn't worth anything without an opportunity for professional examination. If a doctor hasn't ever examined you and he says you have leukemia, what is his statement worth? Nothing.

Q Is a diagnosis an opinion?

A Certainly it is. It's a professional opinion. It's a statement that the doctor believes you have such and such a condition or disease.

## III

In *New York Times,* 376 U.S. 254, the Supreme Court laid down new law in the field of defamation. It held that in a state libel trial a public official in order to recover for defamatory statements concerning his official conduct must establish "actual malice." This was defined as knowing falsity or reckless disregard for the truth on the part of the publisher. This criteria has been refined somewhat over the years. For instance, in *St. Amant v. Thompson,* 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968), the Court said:

Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison v. Louisiana,* 379 U.S. 64 (1964), . . . the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity." 379 U.S., at 74. Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that

reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. [*Id.* at 731.]

The Court quoted this exact language in *Time, Inc. v. Pape,* 401 U.S. 279, 291-92, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971).[3] In *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S. Ct. 465, 42 L. Ed. 2d 419 (1974), Mr. Justice Stewart referred for the Court to the definition of actual malice in *New York Times* and said:

As so defined, of course, "actual malice" is a term of art, created to provide a convenient shorthand expression for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers. As such, it is quite different from the common-law standard of "malice" generally required under state tort law to support an award of punitive damages. [*Id.* at 251-52.]

A mere showing that a publisher acted negligently is not sufficient to establish "actual malice." *Garrison v. Louisiana,* 379 U.S. 64, 79, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964). A public official is not permitted to recover because his attacker is motivated by ill-will or even hatred,

---

**3.** L. Eldredge, *The Law of Defamation* § 51 (1978), states relative to this rule:

This definition of "actual malice" is not found in the common law decisions. It is really Lord Herschell's famous definition of scienter in an action of deceit, Derry v. Peek, [1889] 14 A.C. 337. In more recent cases the Supreme Court has avoided using the term "actual malice" and has referred to a statement made "with knowledge of its falsity or with reckless disregard for the truth," Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L. Ed. 2d 789, 807 (1974), per Powell, J. [*Id.* 254, n. 41.]

*Garrison,* 379 U.S. at 73-74, or because the speaker had a desire to injure the official, *Beckley Newspapers v. Hanks,* 389 U.S. 81, 82, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967).

In *St. Amant* the Supreme Court provided some guidance as to what might be sufficient to meet the test under *New York Times* and at the same time demonstrated that it had not abandoned the concern of individuals for their reputations:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [*Id.* 390 U.S. at 732 (Footnotes omitted).]

Cases deciding what constitutes actual malice are collected and analyzed in Annot., 20 A.L.R.3d 988 (1968).

Since the Supreme Court in *Cantrell,* 419 U.S. 245, reversed a lower court decision which held that sufficient evidence of actual malice to support a jury verdict had not been adduced, it is of interest to note the facts of that case. Mrs. Cantrell's husband, along with 43 other people, had been killed in a bridge collapse. A number of months later a reporter who covered the incident at the time for a Cleveland newspaper wrote a lead feature for that paper's Sunday magazine. Mr. Justice Stewart summarized for the Court:

> It is conceded that the story contained a number

of inaccuracies and false statements. Most conspicuously, although Mrs. Cantrell was not present at any time during the reporter's visit to her home, Eszterhas wrote, "Margaret Cantrell will talk neither about what happened nor about how they are doing. She wears the same mask of non-expression she wore at the funeral. She is a proud woman. Her world has changed. She says that after it happened, the people in town offered to help them out with money and they refused to take it." Other significant misrepresentations were contained in details of Eszterhas' descriptions of the poverty in which the Cantrells were living and the dirty and dilapidated conditions of the Cantrell home. [*Id.* at 248.]

The Court concluded that "the District Judge was clearly correct in believing that the evidence introduced at trial was sufficient to support a jury finding that the respondents . . . had published knowing or reckless falsehoods about the Cantrells." *Id.* at 252-53.

In *Garrison,* 379 U.S. 64, Mr. Justice Brennan said for the Court:

The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. [*Id.* at 75.]

In *New York Times* Mr. Justice Brennan said for the Court that the proof adduced in that case "to show actual malice lack[ed] the convincing clarity which the constitutional standard demands . . . ." *Id.* 376 U.S. at 285-86. Hence, courts have come to say that "clear and convincing proof" is required. *See, e.g.,* L. Eldredge, *The Law of Defamation* § 51 at 254 (1978), and *Gertz v. Robert Welch,*

*Inc.,* 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). In the latter case Mr. Justice Powell said for the Court:

> The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. [*Id.* at 342.]

The term "clear and convincing proof" was discussed by Justice Hennessey for the Supreme Judicial Court of Massachusetts in *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975):

> The *New York Times* and the *Gertz* cases offer no definition of the meaning of "clear and convincing proof," to assist in formulating jury instructions. However, from other sources we find the phrase defined. Clear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a fair preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases. See *Foley v. Coan,* [272 Mass. 207, 172 N.E. 74 (1930)]; *Coghlin v. White,* [273 Mass. 53, 172 N.E. 786 (1930)]. It has been said that the proof must be "strong, positive and free from doubt" (*Coghlin v. White, supra,* at 55, quoting from *Newell v. Homer,* 120 Mass. 277, 280 [1876]), and "full, clear and decisive" (*Kidder v. Greenman,* [283 Mass. 601], 613, [187 N.E. 42 (1933),] and cases cited). See generally, Wigmore, Evidence, § 2498 (3) (3d ed. 1940). [*Id.* at 871.]

See also *Callahan v. Westinghouse Broadcasting Co., Inc.,* 372 Mass. 582, 363 N.E.2d 240 (1977).

For a discussion of the term "clear and convincing evidence" and analogous statements as to a degree of evidence see C. McCormick, *Handbook of the Law of Evidence* § 340 (2d ed. Cleary 1972); 30 Am. Jur. 2d, *Evidence* §§ 1164, 1166-67 (1967); and 32A C.J.S., *Evidence* § 1023 a (1964).

This Court has used the term "clear and convincing evidence" in the context of judicial disabilities and attorney grievance. *See, e.g., In Re Diener and Broccolino,* 268 Md. 659, 304 A.2d 587 (1973), and *Attorney Griev. Comm'n v. McBurney,* 283 Md. 628, 630, 392 A.2d 81 (1978). The Court also has used analogous terms. For instance, in *Quillen v. Bell,* 158 Md. 677, 682-83, 149 A. 462 (1930), speaking of "the hesitation of courts to contradict titles of record upon parol proof of opposing facts," Chief Judge Bond said for the Court, "The essential facts must be established clearly, with small possibility of error left." In *Zulver v. Murray,* 139 Md. 242, 244, 114 A. 896 (1921), the Court stated, "To establish an implied trust by parol evidence, the testimony must be of the most convincing character." *Duvall v. Hambleton & Co.,* 98 Md. 12, 55 A. 431 (1903), was an equity action to establish a lien on certain shares of stock pursuant to a parol agreement. There the Court referred to the need for "clear, explicit and strict proof . . . ." *Id.* at 20. In *Whalen v. Milholland,* 89 Md. 199, 43 A. 45 (1899), the Court was involved with a controversy over a savings bank deposit. Chief Judge McSherry said for the Court:

> These death-bed donations, to be upheld, ought to be above question or suspicion at all times, but more especially when they render inoperative, as they would in this case, the provisions of a will made at a calmer and more collected moment. The evidence to support them ought to be clear and free from uncertainty . . . . [*Id.* at 210.]

We do not appear to have defined the term "clear and convincing evidence." Judge Orth did define it, however, for

the Court of Special Appeals in *Whittington v. State,* 8 Md. App. 676, 679, n. 3, 262 A.2d 75 (1970), as "more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. . . ." It would be immediately perceived that this is almost precisely the definition given by the Supreme Judicial Court of Massachusetts in *Stone.* We adopt that definition. We point out in this regard the observation in 30 Am. Jur. 2d, *Evidence* § 1167:

> The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure — that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence. [*Id.* at 345-46.]

See also *Addington v. Texas,* 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

## IV

Citing *Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 278 A.2d 71 (1971); *Harris v. Baltimore,* 151 Md. 11, 133 A. 888 (1926); and *Karangelen v. Snyder,* 40 Md. App. 393, 391 A.2d 474 (1978), the Court of Special Appeals concluded that since Delia was a police officer he was a public official within the meaning of *New York Times.* Only *Karangelen* states

that a police officer is a public official within the purview of *New York Times.* Its holding is made without analysis, merely citing *Robinson, Harris,* and *Wilkerson v. Baltimore County,* 218 Md. 271, 146 A.2d 28 (1958), for this proposition. *Robinson, Harris,* and *Wilkerson* were all concerned with a public official in a context entirely different from *New York Times. Robinson* was a tort action in which the plaintiff attempted to recover for injuries said to have been inflicted upon him by police officers in the process of an arrest. *Wilkerson* and *Harris* each were decided before *New York Times. Wilkerson* held that Baltimore County was not liable for the alleged tort of a police officer because it was exercising a governmental function when it employed him. In *Harris* the Court had before it the question of whether a park policeman employed by the Park Board of Baltimore City was an officer or a workman employed for wages within the meaning of the Workmen's Compensation Act.

The Supreme Court made it abundantly clear in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966), that decisions such as those relied upon by the Court of Special Appeals are not authority as to whether an individual is a "public official" within the context of the *New York Times* rule since they arose under altogether different circumstances. The determination is not to be made by state-law standards. Mr. Justice Brennan said for the Court:

> Turning, then, to the question whether respondent was a "public official" within *New York Times,* we reject at the outset his suggestion that it should be answered by reference to state-law standards. States have developed definitions of "public official" for local administrative purposes, not the purposes of a national constitutional protection. If existing state-law standards reflect the purposes of *New York Times,* this is at best accidental. Our decision in *New York Times,* moreover, draws its force from the constitutional protections afforded free expression. The standards

that set the scope of its principles cannot therefore be such that "the constitutional limits of free expression in the Nation would vary with state lines." *Pennekamp v. Florida,* 328 U.S. 331, 335.

We remarked in *New York Times* that we had no occasion "to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." 376 U.S., at 283, n. 23 . . . . It is clear . . . that the "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. [*Id.* at 84-85 (footnote omitted).]

*Rosenblatt* was analyzed and what constitutes a public official was discussed by Judge Orth for this Court in *A.S. Abell Co. v. Barnes,* 258 Md. 56, 63-67, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921 (1971).

As recently as this past summer Chief Justice Burger said for the Court in *Hutchinson v. Proxmire,* 443 U.S. 111, 119, n. 8, 99 S. Ct. 2675, 2680, 61 L. Ed. 2d 411 (1979), "The Court has not provided precise boundaries for the category of 'public officials'; it cannot be thought to include all public employees, however."

There are cases holding police patrolmen to be public officials within the meaning of *New York Times. See, e.g., Moriarty v. Lippe,* 162 Conn. 371, 378-79, 294 A.2d 326, 330-31 (1972); *Coursey v. Greater Niles Towp. Pub. Corp.,* 40 Ill.2d 257, 264-65, 239 N.E.2d 837 (1968), and cases collected and analyzed in 19 A.L.R.3d 1361, § 5 (1968).[4] The circuit

---

4. Professor Eldredge, *op. cit.* § 51, sets forth some of the practical difficulties involved with the *New York Times* rule and the determination of who is or is not a "public official" within its meaning:

Although the Supreme Court of the United States is firmly committed to the *New York Times* rule, its devastating effect on innocent, falsely defamed persons should be a factor in considering

court and the parties have all proceeded upon the theory that Delia is a public official within the meaning of *New York Times.* The question of whether he is or is not such a public official has not been briefed or argued to us. Accordingly, we prefer to decide the case assuming arguendo that he is such a public official and to leave open in Maryland the question of whether a police officer at the very bottom level is a public official within the meaning of *New York Times.* In so doing we act in a manner similar to that of the Supreme Court in *Time, Inc. v. Pape,* 401 U.S. 279, 284, where the two lower courts "were in agreement that the plaintiff Pape was a 'public official' by virtue of his position as Deputy Chief of Detectives of the Chicago Police Department, and that the charges [before the Court] concerned his 'official conduct.'"

who is a "public official" within the meaning of that case. Persons who run for major political office such as Congress, the state legislature, high executive office, or judicial office, must be thick-skinned. They have to take a lot of abuse, and this has not deterred able men and women from seeking office in the past in states such as Kansas which followed the minority "liberal" rule as to the scope of "fair comment" or elsewhere in the United States since *New York Times* was decided in 1964. But what about the leading citizens in small communities who serve on school boards, zoning boards, township commissions, planning commissions, environmental commissions, etc.? These positions are sometimes elective, sometimes appointive; some of them carry a modest salary, some have no salary attached. They are frequently filled by busy lawyers, doctors, architects, bankers, and merchants who believe they owe some of their time to community service and are also not insensible to the fact that the position has some degree of prestige attached to it. The work of all of these groups deals with matters of legitimate public interest, as, for example, changes in zoning ordinances or new educational policies in a public school. In the past, local communities have benefited from the frequently, practically, "free" services of a lot of the best brains in the community. They are busy, often sensitive, people, and it is generally a real burden upon them to perform these community duties. Will they continue to serve if they thereby become game for local weekly newspapers and other critics, who have a perpetual open season to shoot at them with false defamation, behind the protective breastworks of the *New York Times* rule? The question is not fanciful. In . . . *Fegley* [*v. Morthimer,* 204 Pa. Super. 54, 202 A.2d 125 (1964)], Dr. Fegley did resign from the school board and withdrew from other community activities after the local editor's outrageous and completely baseless attack upon him as chairman of the new school building committee. The editors of many newspapers do not have the sense of fairness and editorial restraint which exists in the *New York Times.* There is an area in which the *New York Times* restrictions on actionable defamation could deprive a community of services which are vitally necessary to its efficient government. [*Id.* at 271-72.]

V

Doubts as to the propriety of summary judgment in a case such as this have been expressed. For instance, in *Goldwater v. Ginzburg,* 261 F. Supp. 784 (S.D.N.Y. 1966), *aff'd,* 414 F.2d 324, 337 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049 (1970), it was observed in denying summary judgment in a case involving the *New York Times* rule:

> The issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns "motive, intent, and subjective feelings and reactions." Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962); see also 6 Moore's Federal Practice (2d ed.) 2581. The Supreme Court has cautioned against summary judgment "where motive and intent play leading roles." Poller v. Columbia Broadcasting Co., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).
>
> Moreover, since the question deals with the state of mind of defendants Ginzburg and Boroson, plaintiff ought to be able to have their testimony before the trier of fact in open court on cross-examination. [*Id.* at 788.]

Last summer in *Hutchinson,* 443 U.S. at 120, Chief Justice Burger stated for the Court, "Relying upon cases from other courts, the District Court said that in determining whether a plaintiff had made an adequate showing of 'actual malice,' summary judgment might well be the rule rather than the exception. [*Hutchinson v. Proxmire,* 431 F. Supp. 1311,] 1330 [(W.D. Wis. 1977)]." The Court then went on to say in a footnote:

> 9. Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times Co. v. Sullivan,* 376 U.S.

254 (1964), and does not readily lend itself to summary disposition. See 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590-592 (1973). Cf. *Herbert v. Lando,* 441 U.S. 153 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us. [*Id.* 443 U.S. at 120.]

*See also Wolston,* 443 U.S. at 161, n. 3. For the view that summary judgment is proper in such cases *see, e.g., Washington Post Co. v. Keogh,* 125 App. D.C. 32, 365 F.2d 965 (1966), *cert. denied,* 385 U.S. 1011 (1967), and *Jenoff v. Hearst,* 453 F. Supp. 541 (D. Md. 1978), the latter of which uses language similar to that used by the *Hutchinson* trial court.

In *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962), to which the trial court made reference in *Goldwater,* Mr. Justice Clark said for the Court:

We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice." [*Id.* at 473.]

Berkey contends strenuously that the sum total of the material before the trial court on the motion for summary judgment was not sufficient to meet the standard of clear and convincing proof of actual malice. The argument is based in part on the fact that in his deposition Delia was unable to specify facts to support his allegations that Berkey

knew when he made statements relative to Delia's mental condition that those statements were false. Berkey argues:

> The respondent must present to the trial court enough evidence giving rise to a genuine issue of material fact, which, if believed, could persuade a jury with convincing clarity that the petitioner acted with actual malice. The trial court has the important responsibility to determine whether the plaintiff has sustained this burden. Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, *it should grant summary judgment for the defendant.* (Emphasis in original.)

In *Tellez v. Canton R.R.,* 212 Md. 423, 430, 129 A.2d 809 (1957), Judge Emory H. Niles, a conceded authority on such matters who was sitting by special assignment, said for the Court, "The function of the summary judgment procedure is not to try the case or to decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly." This Court has said repeatedly that such procedure is not a substitute for trial. Our cases make plain that credibility is not an issue to be decided on summary judgment. *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 178, 274 A.2d 121 (1971), and cases there cited. We are of the view that 30 Am. Jur. 2d *Evidence* § 1167, to which we have heretofore referred, is correct in stating, "Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence." *Id.* at 346.

In evaluating whether summary judgment should have been entered in this case we must look at the matter as a whole, resolving all inferences in favor of the police officer against whom the motion for summary judgment was made. As we have already observed, if the underlying facts are susceptible of more than one permissible inference, the

choice between those inferences should not be made as a matter of law but should be submitted to the trier of fact.

The police officer attached Dr. Berkey's letter to his declaration "and made [it] a part [t]hereof." He said it "contain[ed] false and defamatory statements with regard to the plaintiff's actions and behavior when he stopped the defendant while on patrol, and the plaintiff's general mental state." He averred that "[t]hese statements include[d], but [were] not limited to" the portion of the letter set forth in the first count of the declaration.

In our evaluation we regard it as relevant to compare directly Berkey's and Delia's versions of the incident which gives rise to this controversy:

| Berkey (as contained in his letter) | Delia (as contained in his answer to interrogatories) |
| --- | --- |
| He asked for my license and automobile registration but gave me *no reason* (until asked); he had high power spot lights directed at my car and upon request, he refused to deflect or turn them off. After writing up the summons, he *refused* to repeat his inaudible instructions and insisted I sign the summons immediately or that he would "take me in." Private Delia kept the high powered lights directed into my wife's eyes, my twelve year old son's eyes and my own — while he kept his back toward the beam. (I couldn't identify Private Delia if my life depended on it because of the blinding light). | When the vehicle pulled to the shoulder of the road, I turned on the high intensity lights and spot light to illuminate the vehicle and approached the operator, Dr. Berkey. I requested the operator's license and registration but before I could explain the reason for the traffic stop, the operator demanded an explanation. I advised Dr. Berkey it was for speeding, for which he would receive a ticket, and again asked for the license and registration. After giving them to me Dr. Berkey told me to put out the lights on my car because they were blinding him. I advised him that the lights were on for |

328

I regard his behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punative [sic]. I neither look nor behave like a fugitive, but I, as well as my wife and son, were treated by Private Delia as such. [Emphasis in original.]

both his safety and mine and returned to my cruiser, where I prepared a traffic ticket for speeding — 70 m.p.h. in a 55 mile zone. I then returned to Dr. Berkey's car and advised him that I had issued a ticket for speeding, explained the ticket and the requirement for signing it. Dr. Berkey then asked a series of questions about the ticket and then he said he could not hear me. I repeated the portion which explained his signature, and he took the summons book from me. After he had the book he asked me several questions about the candle power of the lights and began writing across the bottom of the citation. I asked Dr. Berkey not to write on the ticket, but he continued to do so until I advised him to either sign the ticket or face arrest. Dr. Berkey signed the ticket, but began to ask personal questions. I refused to answer the questions, took the ticket book from him, gave him his copy of the ticket and returned to service.

Delia deposition (examination by counsel for Berkey)

Q. . . . When you stopped the vehicle operated by Dr. Berkey, you pulled up behind him, is that correct?
A. Yes, sir.

A direct conflict between the Berkey and Delia versions of the incident is inferrable. People riding in a motor vehicle normally face forward. Thus, they would not be blinded by high-powered lights directed from a vehicle to the rear. Such a light, were the driver in his normal position, might possibly be reflected into his eyes from the rearview mirror, but such glare could be immediately eliminated either by movement of the mirror or by a change of the individual's position. Here the indications are that Delia was in the usual position of a police officer who has stopped a motor vehicle, that is to the left of the vehicle by the driver. If Berkey were talking to the officer or in any way paying any attention to him, the light from such a mirror would not be reflected into his eyes. Moreover, since rearview mirrors on motor vehicles are directed at the driver, it being he who has the need for such mirrors, it follows that there would have been no reflection from the mirror into the eyes of Berkey's son or his wife. They would not otherwise be blinded by a light to the rear of their vehicle unless they chose to turn around and stare at it.

Most of the cases which have come to our attention applying the *New York Times* standard either have had some segment of the media as a defendant or have had as a defendant an individual connected with the media and the controversy has involved publication in the media. In this instance the alleged defamation was not communicated in the media but in a letter to the police officer's superior and in oral statements to the investigator sent to interview Berkey as a result of that letter. The letter to the Chief of Police of Prince George's County, if its statements of fact were true, would have the effect of undermining Delia's standing with that department. *New York Times* has two prongs, knowing falsity or reckless disregard for the truth.

When two people describe the basic fact of reflection of light in the conflicting manner we have here, it is obvious that a jury might find clearly and convincingly that one of them must have known that he was speaking falsely.

The facts here are in sharp contrast to those in *Time, Inc. v. Pape, supra,* 401 U.S. 279. In that case a writer analyzed a number of public documents and wrote a story based upon his interpretation. The Court held that the plaintiff failed to meet the *New York Times* standard. Here we do not have interpretation, but direct observation. The fact that this is a "one on one" situation in no way precludes a determination by clear and convincing evidence as to which is speaking truthfully. That this is so is readily understood when we point out that in a criminal case an individual may be convicted upon the testimony of one witness who says that he saw the accused do the act constituting the crime notwithstanding the fact that the accused may say that he was not even present at the scene of the crime. Proof beyond a reasonable doubt, required in criminal cases, is a higher standard than proof by clear and convincing evidence required in a defamation case such as this.

We have said relative to expert witnesses that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. *See, e.g., County Council v. District Land,* 274 Md. 691, 704, 337 A.2d 712 (1975), and cases there cited. It is apparent that Berkey regards Delia's "behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punitive" upon the basis of his own observation of this incident. If the trier of fact were to determine that Berkey spoke a calculated untruth in giving his version of the incident, the version which is the basis for Berkey's conclusion relative to Delia's mental condition, then a trier of fact could conclude that Berkey spoke with reckless disregard for the truth when he used the adjectives which he did to characterize Delia's behavior on this occasion. In this regard we note the comment of Mr. Justice Brennan for the Court in *Garrison,* 379 U.S. 75 relative to "use of calculated falsehood"; *Henry v. Collins,* 380 U.S. 356, 85 S. Ct. 992, 13 L. Ed. 2d 892

(1965), a case applying *New York Times* standards, where the Court recognized that an "intent to inflict harm through falsehood" is actionable by a public official; and Bogen, *The Supreme Court's Interpretation of the Guarantee of Freedom of Speech,* 35 Md. L. Rev. 555 (1976), stating:

> [U]nless innocent falsehoods are protected, valid criticisms of governmental conduct may be stifled. The calculated falsehood, however, needs no such protection. As long as the populace is aware that it is the calculation and not the falsity that exposes one to punishment, the innocent speaker will not be deterred from saying what he believes to be true. The Court need focus only on the knowledge of the speaker and not on the truth of his statement or the quality of his ideas. Again the Court is concerned with the elimination of an evil by means which are not directed to the content of the words. [*Id.* at 605-06.]

The letter here in question was on Berkey's professional letterhead. A permissible inference is that he desired his professional knowledge to be taken into consideration when he referred to his "professional background and training" in stating, "I question if [Delia] is mentally deranged [or] psychopathic and/or pathologically sadistic." The letter thus goes beyond an ordinary complaint of an outraged citizen to the supervisor of one alleged to have acted improperly. Berkey was not in this instance the ordinary citizen. Moreover, the letter not only was directed to the chief of police, but a copy of it was transmitted to a District Court judge.

Berkey now argues that because he "question[ed] if this young officer [was] mentally deranged, if he [was] psychopathic and/or pathologically sadistic," this was not an allegation. The answer to this is well illustrated by the response of Dr. Crowley to a question propounded by Berkey's counsel as to whether Crowley regarded these statements as allegations:

> The form does include "I question," but if I could

give you an example, if I may, if I wrote a letter to the chief judge about you gentlemen saying that I seriously question if all of the lawyers in the room are criminals, who are insane or who steal their clients' money, I think you would have to say that I did more than passively raise a question. I acknowledge that it says, "I question if," but the language is extremely forceful and I think that the paragraph has the effect of making those allegations against the officer. That's the way I construe it.

The fact that this is more than a question is pointed up by Berkey's next statement, that he was "formally request[ing] a mental evaluation of Private Delia."

The facts here are susceptible of an inference that Berkey wrote and spoke relative to Delia with knowledge of the falsity of that which he said as to the basic incident and with reckless disregard for truth or falsity in his characterization of Delia's conduct as "cruel and inhumane, rude and insensitive, threatening and punitive" and his suggestion that as a consequence Delia might be "mentally deranged, ... psychopathic and/or pathologically sadistic."

Although we have doubts as to the propriety of summary judgment in a defamation case involving the *New York Times* rule, we do not go so far as to say that in no case arising in Maryland where that rule is applicable would it be improper to decide the case on a motion for summary judgment. Such matters must be determined on a case by case basis. Since credibility of witnesses may not be weighed on a motion for summary judgment, we do say that on the facts of this case the trial court improperly granted summary judgment. As Mr. Justice Clark said for the Court in *Poller,* 368 U.S. at 473, "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" Thus, whether Delia adduces clear and convincing evidence to support his action against Berkey must be determined by the trier of fact who will weigh, compare, test, and judge its worth, considering it in connection with all the

facts and circumstances presented in evidence. The Court of Special Appeals quite properly determined that this case should be tried.

> *Judgment affirmed; case remanded to the Court of Special Appeals for further remand for trial; appellant to pay the costs.*

*Eldridge, J., dissenting* :

The majority decision in this case upholds, in my opinion, a serious intrusion upon First Amendment rights. It warns all persons who might be inclined to complain about government officials that they do so at their peril in this State. Today's decision, subjecting a critic of police conduct to a full trial and possible heavy damages, even though no evidence of actual malice was adduced, clearly may have a chilling effect upon free speech.

The right of public officials to recover damages in defamation actions brought against critics of their official conduct has been severely limited by the Supreme Court in a series of decisions beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). The constitutional standard established by the First Amendment requires the official to prove that the allegedly defamatory statement for which he seeks recovery was made with " 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-280, 84 S. Ct. at 726.

"Actual malice" cannot be established merely by showing that the publisher acted negligently, *Garrison v. Louisiana,* 379 U.S. 64, 79, 85 S. Ct. 209, 218, 13 L. Ed. 2d 125 (1964), or failed to undertake the investigation which would have been made by a reasonably prudent person, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968). Nor can the public official recover because his attacker is motivated by ill-will or even hatred, *Garrison v. Louisiana, supra,* 379 U.S. at 73-74, 85 S. Ct. at 215, or

because the speaker had a desire to injure the official, *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82, 88 S. Ct. 197, 198, 19 L. Ed. 2d 248 (1967). Rather, as a condition precedent to recovery the official must show not only that the questioned statements were false, but that they were published with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana, supra,* 379 U.S. at 74, 85 S. Ct. at 216. "There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication." *St. Amant v. Thompson, supra,* 390 U.S. at 731, 88 S. Ct. at 1325. (Emphasis added.)

The "subjective awareness of probable falsity," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334 n. 6, 94 S. Ct. 2997, 3004, 41 L. Ed. 2d 789 (1974), which is required to demonstrate the existence of "actual malice," may be established "only on clear and convincing proof." 418 U.S. at 342, 94 S. Ct. at 3008. The "constitutional standard demands" proof which has "convincing clarity." *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285-286, 84 S. Ct. at 729. The Court set forth these standards

> "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*Id.* at 270, 84 S. Ct. at 721.)

In the instant case, the plaintiff is a police officer. As such he is a public official, and a defamation action brought by him against a citizen-critic is governed by the standards of *New York Times Co. v. Sullivan.* This is not disputed in this case. Moreover, as noted by the Illinois Supreme Court, even though a patrol officer is not in a policy-making position, his duties are peculiarly public. "The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be

inhibited by threat of prosecution under State libel laws." *Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill. 2d 257, 239 N.E.2d 837, 841 (1968). *See also, e.g., St. Amant v. Thompson, supra,* 390 U.S. at 728-730, 88 S. Ct. at 1324-1325 (deputy sheriff); *Henry v. Collins,* 380 U.S. 356, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965) (town police chief); *Meiners v. Moriarity,* 563 F.2d 343 (7th Cir. 1977) (federal drug agents); *Jackson v. Filliben,* 281 A.2d 604 (Del. 1971) (police sergeant); *Rawlins v. Hutchinson Publishing Co.,* 218 Kan. 295, 543 P.2d 988 (1975) (former police officer); *Hirman v. Rogers,* 257 N.W.2d 563 (Minn. 1977) (two police officers and deputy sheriff); *N.A.A.C.P. v. Moody,* 350 So. 2d 1365 (Miss. 1977) (highway patrolman); *Malerba v. Newsday,* 64 A.D.2d 623, 406 N.Y.S. 2d 552 (1978) (police patrolman).

Consequently, the pertinent issue is not whether Dr. Berkey may have acted unprofessionally, or may have been motivated by ill-will, or may have been attempting to injure Officer Delia. Instead, the issue is whether Dr. Berkey knew that his statements were false or acted with reckless disregard for their truth. Furthermore Officer Delia must prove that this standard was met by clear and convincing evidence. Finally, as the majority opinion acknowledges, it was incumbent upon Officer Delia, in order to overcome the defendant's motion for summary judgment, to present sufficient evidence from which a trier of fact could find or infer, applying the "clear and convincing" test, that Dr. Berkey was aware of the falsity of his statements or uttered them with reckless disregard of whether they were false or not.

There is in this case utterly no evidence of knowing falsity or reckless disregard for the truth. If the facts and justified inferences from them in this case constitute a sufficient basis to defeat summary judgment, permit the case to go to the jury and support a jury verdict against Dr. Berkey, then the standard of *New York Times Co. v. Sullivan* becomes almost meaningless.

The majority purports to find some evidence that Dr.

Berkey knew of the falsity of his statements by a most tortured reasoning process. It begins with a false premise and then draws some highly dubious conclusions. After setting forth Berkey's and Delia's versions of the incident, the majority states that a direct conflict exists between the two versions. The supposed conflict, apparently, is between Berkey's allegations that the high powered lights were in his wife's and son's eyes and that the light was "blinding," and Delia's statement that the police car was behind Berkey's vehicle. However, this is not necessarily a conflict. Berkey at no time suggested that the police car was any place other than behind his car. And Delia's statement itself acknowledges that Berkey viewed the light as "blinding" at the time, for he said that "Dr. Berkey told me to put out the lights on my car because they were blinding him. . . . After he had the book he asked me several questions about the candle power of the lights." It is clear from both versions that, at the time the incident occurred, Berkey considered the lights to be "blinding." Because the members of this Court, who are evidently experts concerning light reflection, now view such evaluation of the light as too extreme, because of the position of the police car, does not create a conflict between the two versions of the incident.[1] Actually, upon analysis, the two versions of the highway incident are remarkably consistent. There is no real conflict between the basic *facts* recounted. Rather, the difference is in the evaluation of those facts. Consequently, in finding evidence of knowing falsity or reckless disregard for the truth, the majority starts with the false premise that "a direct conflict" in the two versions of the incident is shown.

From the premise that there is a conflict between the versions of the incident, the majority goes on to draw some extraordinary conclusions. It is first said: "When two people describe the basic fact of reflection of light in the conflicting manner we have here, it is obvious that a jury might find clearly and convincingly that one of them must have known that he was speaking falsely." After stating that either

---

1. In fact, Delia stated in a deposition that he had "occasionally" had complaints about the lights from other persons that he had stopped.

Berkey or Delia was not "speaking truthfully," the majority then concludes that if "Berkey spoke a calculated untruth in giving his version of the incident, . . . then a trier of fact could conclude that Berkey spoke with reckless disregard for the truth when he used the adjectives which he did to characterize Delia's behavior on this occasion."

Even if I agreed with the majority that there is a real conflict between the versions of the incident, these two conclusions are absurd. It is amazing to me that judges and former practicing attorneys would say that merely because two individuals give conflicting versions of an incident, it follows that one knew that he was speaking falsely. Nothing is better known to members of the legal profession than the fact that different participants or eyewitnesses to an incident may, with all honesty and sincerity, give conflicting accounts of what happened. It is common knowledge that individuals perceive things differently. Under the majority's reasoning, whenever conflicting eyewitness testimony is given at a trial, it may be concluded that one of the witnesses must have committed perjury.

The final conclusion drawn by the majority is similarly invalid. The majority states that if Dr. Berkey told an untruth about one matter, *i.e.,* the "blinding light," it follows that he spoke with reckless disregard for the truth when he used certain adjectives to characterize Delia's behavior. While evidence that a witness told an untruth may be considered for purpose of impeaching his credibility, it certainly does not furnish a plaintiff with affirmative "clear and convincing" evidence of the witness's reckless disregard for the truth with respect to a different utterance.

In the instant case, there simply was no evidence that Dr. Berkey knew of the falsity of his statements concerning Officer Delia, regardless of how one analyzes or views those statements, and there certainly is no evidence that Berkey spoke a deliberate or calculated untruth. The majority has constructed extremely tenuous inferences upon Berkey's alleged false statements. However, actual malice may not be inferred solely from the fact that a false factual statement

**338**

was made, *New York Times Co. v. Sullivan, supra,* 376 U.S. at 284-286; *Colombo v. Times-Argus Ass'n, Inc.,* 135 Vt. 454, 380 A.2d 80 (1977). It is apparent that the inferences drawn by the majority from the alleged falsehoods are too weak to satisfy the "clear and convincing proof" requirement of *New York Times.* After giving full consideration to Delia's allegations and the statements of Dr. Crowley included in the majority opinion, Delia at best has shown only that Berkey was motivated by ill-will and spite or had acted negligently and unprofessionally in attempting to evaluate Delia's personality upon an inadequate factual basis and without further investigation. This is insufficient to meet the test of *New York Times Co. v. Sullivan.*

Furthermore, a case like the present one is particularly inappropriate for a relaxation of the stringent standards set forth in *New York Times Co. v. Sullivan.* This is not a case where an outside observer of government action disseminates to the public allegedly false statements of fact concerning a public official. Instead, in the present case, an outraged target of official government action, using strong language of his own profession, in effect set forth his opinion concerning that action in a complaint to the government and a request for an investigation.[2] Dr. Berkey was arrested by Officer Delia; he obviously entertained the opinion that the officer mistreated him during that arrest; and he made the

---

**2.** Statements of opinion, rather than of fact, are treated differently for First Amendment purposes. *Cf.* Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-340, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789 (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

*See* Letter Carriers v. Austin, 418 U.S. 264, 284, 94 S. Ct. 2770, 2781, 41 L. Ed. 2d 745 (1974) (". . . use of words like 'traitor' cannot be construed as representations of fact. As the Court said long before . . ., 'to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies — like "unfair" or "fascist" — is not to falsify facts.' Cafeteria Employees Local 302 v. Angelos, 320 U.S. 293, 295, 64 S. Ct. 126, 127, 88 L. Ed. 58 (1943).").

*See also* Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 14, 90 S. Ct. 1537, 1542, 26 L. Ed. 2d 6 (1970), reversing this Court, 253 Md. 324, 252 A.2d 755, and holding that use of the word "blackmail" under the circumstances was "no more than rhetorical hyperbole, a vigorous epithet used by those who consider . . . [the plaintiff's] position extremely unreasonable."

allegedly defamatory statements in connection with a request for an investigation by the officer's superiors. Certainly, a citizen has a First Amendment right to complain about a public official to that official's superior in government, to raise questions about the official, to request an investigation by the governmental agency involved, and to speak frankly when questioned by a government investigator conducting the investigation. A case like the present one may well implicate the "redress of grievances" clause of the First Amendment along with the "freedom of speech" clause.

In somewhat similar circumstances, the Supreme Judicial Court of Maine held in *Michaud v. Inhab. of Town of Livermore Falls,* 381 A.2d 1110 (Me. 1978), that a judgment notwithstanding the verdict should have been granted by the trial court. The plaintiff, a state employee, had alleged that he was defamed by a letter written to the governor complaining of plaintiff's conduct at a public town meeting relating to efforts to consolidate transportation programs. The defendant's letter to the governor generally stated that he had been insulted, looked down upon and treated with contempt at the meeting by the plaintiff, and that the plaintiff was arrogant and a pseudo-intellectual bureaucrat. At trial, the plaintiff and several witnesses on his behalf testified that the plaintiff's statements and conduct at the meeting had not been as alleged in the letter. The defendant, however, contradicted the plaintiff's version of the incident. After stating that the testimony presented by the plaintiff was sufficient, if believed by the jury, to establish that the accusations in the letter were false, the court held that the evidence was insufficient to support the jury verdict for the plaintiff because it did not prove with convincing clarity that the defendant had written the letter with reckless disregard of the falsity of his statements. The court reasoned (381 A.2d at 1115-1116):

> "None of the plaintiff's witnesses, including the plaintiff himself, testified either directly to Boutilier's state of mind or to facts sufficient to enable the jury to infer 'knowledge or reckless

disregard.' In fact, the testimony of the plaintiff's own witnesses establishes the probability that the meeting led to high emotions and resulted in widely varying perceptions and interpretations of the participants' conduct, depending upon each viewer's degree and position of involvement. *On this record there is no evidence, and certainly none of convincing clarity, that the Boutilier letter, although possibly biased and exaggerated, was not an honest communication relating the author's own interpretation of the plaintiff's conduct.*

"Although to some extent Boutilier's mental state might be inferred from the fact of falsehood (assuming the plaintiff's evidence was believed by the jury) and from any 'ill-will' of the defendant toward Michaud, those inferences, standing alone, do not satisfy proof of convincing clarity. It patently is difficult to infer 'reckless disregard' from a jury's finding of falsity here, in view of the close balance between the conflicting testimony on that issue; . . . and the nature of Boutilier's complaint against Michaud related to Boutilier's adverse view of the latter's capability for his State job, a matter of gubernatorial concern, and not to the specifics of transportation in the three-county area. On such shaky inferences a jury would not be justified in finding that Boutilier made the statements 'with the high degree of awareness of their probable falsity' constitutionally required under the Supreme Court's decisions." (Emphasis supplied.)

*See also Cline v. Brown,* 24 N.C. App. 209, 210 S.E.2d 446, *cert. denied,* 286 N.C. 412, 211 S.E.2d 793 (1975) (holding that summary judgment for the defendant should have been granted in libel action; the caution inherent in the use of the word "may" in statements that police officer "may have a personal grudge" and "may have conspired" to kill a person demonstrate absence of reckless disregard for whether statements were false).

In the present case, for the plaintiff to present sufficient evidence of actual malice to create a jury issue, it is not enough for him to show that Dr. Berkey's opinions and questions were unwarranted, or that they were uttered in the language of Dr. Berkey's profession, or that a careful psychiatrist would not have made such statements without having made a professional evaluation, or that Dr. Berkey's evaluation of the conditions during the traffic arrest may have been exaggerated. Actual malice, as defined in the *New York Times Co.* case, cannot properly be inferred from any of these circumstances. Instead, the plaintiff was required to adduce *clear and convincing* evidence that Dr. Berkey, the outraged recipient of a traffic summons, in the course of complaining to the traffic officer's superiors and requesting an investigation, knew that his statements were false or spoke with reckless disregard of their truth or falsity. The plaintiff presented *no* evidence, much less "clear and convincing evidence," of such knowledge.

It is common knowledge that many members of the public, when charged with an offense by a traffic officer, often feel that they have been singled out for unjust treatment. It is not unusual for them to use strong language. Many of these persons in all sincerity do ascribe improper motives to the officer, and believe that the officer should be reported to or investigated by his superiors. While most such beliefs may be unwarranted, a few may have some basis in fact. It is neither sound constitutional law nor sound public policy for courts to discourage these complaints by ordering full trials and allowing recoveries in defamation actions like the present one. The complaints that are justified may well be discouraged along with those that are not.

I am not unsympathetic with a public official, like Officer Delia, who may have been the object of verbal abuse simply for carrying out his duties. I, along with many others, have served as a public employee in various capacities and have also been the recipient of verbal attacks and less than flattering descriptions. No one likes to hear, or have his family and friends hear, such allegations. However, they "come with the job." If one wants to be a public servant in a

free society, he must develop a thick skin. If the First Amendment means anything, it means that a citizen has a right to criticize, even unjustifiably, the conduct of those operating the government. If the government itself can decide which criticisms it will tolerate and which it will not, by its courts freely allowing government officials to bring defamation actions against citizens expressing grievances, then an essential aspect of our freedom is impaired.

Judge Cole has authorized me to state that he concurs with the views expressed herein.